In the Matter of SOL FEIGMAN, Petitioner, v DANIEL KLEPAK, as Commissioner of the New York State Office of Drug Abuse Services, Respondent.

First Department, June 27, 1978

---

### APPEARANCES OF COUNSEL

*Ivan M. Dochter* of counsel (*Joel L. Hecker* with him on the brief; *Rubin, Seidman & Dochter,* attorneys), for petitioner.

*Allan S. Moller* of counsel *(Samuel A. Hirshowitz* with him on the brief; *Louis J. Lefkowitz, Attorney-General),* for respondent.

## OPINION OF THE COURT

FEIN, J.

This CPLR article 78 proceeding to review and annul the determination of respondent which revoked approval for petitioner's operation of a methadone maintenance treatment program and directed that it cease operations within 30 days was transferred to this court pursuant to CPLR 7803 (subd 4) and 7804 (subd [g]) by order of Justice SUTTON, entered November 3, 1977, since the application in part raises issues as to whether the determination by respondent was supported by substantial evidence. The dissenters would hold the proceeding in abeyance pending a hearing on the issue as to "whether there has been invidious discrimination by the respondent" in enforcing the subject statute and regulations "in favor of nonproprietary and against proprietary programs." However, we conclude the present record is insufficient to warrant a hearing. Petitioner's hearsay allegations and conclusory assertions do not raise an issue of fact.

Petitioner, a licensed psychiatrist, has for the last five years operated a methadone maintenance treatment program known as Meth-Aide Methadone Maintenance Treatment Program, Inc. (Meth-Aide). Meth-Aide is a proprietary center. On December 1, 1976, petitioner received notice from the Office of Drug Abuse Services that approval to operate Meth-Aide had been revoked as a result of 13 violations of respondent's regulations. Following a statutory hearing, the hearing officer confirmed the violations, but recommended that a stipulation be entered into which had been agreed to by petitioner, whereby petitioner would voluntarily close the program if future inspection or audit revealed substantial violations. In such event, petitioner agreed to waive any right to administrative or judicial review. On August 16, 1977, the commissioner rejected the hearing officer's recommendation and issued an order which revoked approval to petitioner to continue operation of his methadone maintenance treatment center. By separate order of the Commissioner of Health, petitioner's license to operate a private methadone treatment facility was

revoked pursuant to sections 3352, 3353, 3390 and 3391 of the Public Health Law.

The record amply supports the findings by respondent that petitioner had violated applicable regulations which limited treatment to no more than 225 patients (14 NYCRR 2021.21 [a]). Petitioner continuously violated the regulations by repeatedly increasing without authority the number of patients over a one-year and three-month period to a total of 346 at the time of the inspection held on October 25, 1976. Over that period of time, petitioner persistently increased the number of patients although each of his requests for increased authorization was denied. The latest request to increase the 225 patient limitation to 300 was denied by letter dated October 6, 1976, less than three weeks prior to the October 25, 1976 audit, which disclosed that despite the prior denials of permission, patient census had improperly risen to 346.

Petitioner was also found to have violated the following regulations: (1) 14 NYCRR 2021.15 (c), by failing to provide sufficient nursing staff, in that the failure to increase the number of full-time nurses in accordance with the increase in the number of patients seriously affected the quality of care; (2) 14 NYCRR 2021.15 (d), by failing to provide sufficient counselors, in that petitioner employed only four counselors, two of whom were merely high school graduates; (3) 14 NYCRR 2021.13 (c) (1), by failing to adhere to the prescribed procedure for dispensing take-home supplies of methadone; (4) 14 NYCRR 2021.13 (f), by failing to provide for random scheduling of the collection of urine samples; and (5) 14 NYCRR 2021.13 (g), by failing to schedule weekly disciplinary staff conferences to discuss treatment of individual patients and to consider recommendations of staff members. Such violations patently defeated the purpose of the methadone maintenance program.

The record clearly and fully supports respondent's determination as to petitioner's utter disregard of applicable rules and regulations. Moreover, petitioner plainly failed or refused to correct deficiencies found to exist, despite appropriate notices following prior audits. Petitioner's violations of the regulations were flagrant and willful. Although advised as early as July, 1975, to comply with the applicable rules, and despite denial of two applications in 1976 to increase the number of patients above the 225 patient limitation, petitioner deliber-

ately disregarded the regulations and increased the number of patients to 346.

By reason of petitioner's repeated violations over an extensive period of time respondent was fully justified and warranted in exercising his power to revoke approval of petitioner's continued operation of Meth-Aide.

■ There is no apparent merit to petitioner's unsubstantiated assertion that there has been an invidious discrimination in the enforcement of the statute (Mental Hygiene Law, art 81) and the regulations, that respondent has allegedly routinely enforced the statute and regulations in favor of nonproprietary and against proprietary programs. The nonproprietary centers are publicly operated or operated by nonprofit hospitals and organziations. The dissenters would direct a hearing on this issue, despite petitioner's complete failure to offer affirmative proof to substantiate his naked claim that respondent has selectively enforced the statute and regulations. The mere conclusory assertion of selective, discriminatory enforcement of the statute is insufficient to require that a hearing be held on that issue, particularly in so sensitive a field as this. As the dissenters concede, the hearing officer properly refused to consider the defense of discriminatory, selective enforcement of the statute. There is no reason why we should do so in the face of petitioner's failure to make even a prima facie showing of discrimination in enforcement of the rules.

Insufficient has been shown to warrant a hearing. Petitioner has not met the heavy burden of proof required to sustain his assertion of unfair discrimination. A discriminatory purpose may not be presumed. There must be a showing by extrinsic evidence of "clear and intentional discrimination" (Matter of Di Maggio v Brown, 19 NY2d 283, 290-291). One must prove more than mere nonenforcement against other violators. Three examples are insufficient, particularly where it appears that in none were the alleged violations as flagrant and repeated as those of petitioner. To support an order directing a hearing in an article 78 proceeding, the party must demonstrate the existence of a triable issue of fact (Matter of Bell v New York State Liq. Auth., 48 AD2d 83). Here, there was no such proof. There was no prima facie showing of selective enforcement to substantiate petitioner's charge so as to warrant that a hearing be held (Zaks v Klepak, 59 AD2d 993).

The dissent places primary reliance upon three letters from

respondent relating to deficiencies in the nonproprietary programs of Cumberland Hospital, Bronx State Hospital and the Quincy Village Program. However, the letters do not support petitioner's conclusory assertion of invidious discrimination. They demonstrate affirmative action by respondent against nonproprietary programs in the form of notices or warnings to correct deficiencies in the programs within a prescribed period of time. The letter to Cumberland advised that in the event of noncompliance, a recommendation would be made to the commissioner to withdraw ODAS approval for continued operation of the methadone treatment unit. The letter to Quincy Village directed that the program either comply with applicable regulations within 30 days, or withdraw its registration as a methadone treatment facility. Here, however, the situation is beyond the warning stage found to exist in each of the nonproprietary programs relied upon by the dissent. This petitioner has persistently and over an extensive period of time violated applicable rules and regulations by increasing the number of patients above the 225 patient limitation, despite denials of two separate applications for such an increase. The dissent in essence finds that a hearing is required to determine whether respondent permits nonproprietary programs to continue without correcting existing violations. However, this possibility, alluded to without supporting facts, is insufficient to warrant a hearing on the issue of discrimination. It is neither dispositive nor controlling that no legal action has as yet been instituted against nonproprietary programs. That fact is insufficient to raise a triable issue; nor does it prima facie establish selective enforcement of the rules. The very interoffice memorandum dated December 1, 1976 to Acting Director Gunther, relied upon by the dissent, specifically sets forth the aim "to assure appropriate standards of care for all methadone maintenance treatment programs, whether run by hospitals, individual clinics or private physicians."

Accordingly, the determination of respondent, Commissioner of the Office of Drug Abuse Services, dated August 16, 1977, which revoked approval for petitioner's continued operation of his methadone maintenance treatment program, should be confirmed, without costs.

SILVERMAN, J. (concurring). I join in Justice FEIN's opinion.

I add the following comment:

An unnecessary hearing always places a great burden on

the litigants and the court. But there is a special harm in ordering a hearing on a charge of intentional discriminatory enforcement in the absence of concrete evidence of such intentional discriminatory enforcement.

If all that need be shown to warrant a hearing is that the statute or regulation has been enforced in some cases and not in others, or more stringently in one case than another, then there is a danger that the hearing would be turned into an extended inquiry into the administration by the regulatory agency of its entire relevant program. It would be argued that the petitioners should be allowed to inquire as to what the regulatory agency has done as to every institution involved in the program; what reports of infraction have there been; what inspections; what are the true facts as to each institution; what sanctions has the regulatory agency imposed or not imposed in each case; why those particular sanctions in one case and not in another. And thus the regulatory agency's power to impose sanctions on any particular violator or alleged violator of its rules could be paralyzed and the court put to great burden. The petitioner in the present case would have no incentive to abbreviate or accelerate the hearings, for the end of the hearings might mean the end of petitioner's business. The Trial Judge would be faced with a very difficult task in his effort to keep the hearing within reasonable bounds and prevent abuse. There is no reason in the present case to open the door to such abuse by ordering the hearing.

MURPHY, P. J. (dissenting). In a determination, dated August 16, 1977, respondent Commissioner Klepak revoked petitioner's approval to operate a proprietary methadone maintenance treatment program and directed that his clinic cease operations within 30 days after the mailing of that determination. Petitioner contends, *inter alia,* that there has been invidious discrimination in the enforcement of the statute (Mental Hygiene Law, art 81) and the regulations (14 NYCRR ch XXV) in this area. The hearing examiner correctly refused to accept petitioner's proffered evidence bearing upon his defense of discriminatory selective enforcement of the subject statute and regulations. That defense is properly developed, at the present time, in this article 78 proceeding. (*Matter of Bell v New York State Liq. Auth.,* 48 AD2d 83.)

The petitioner has submitted documentation, from respondent's own files, that suggests that serious violations existed in

three nonproprietary programs but that the respondent has never sought to revoke his approval in any of those cases.

First of all, the petitioner points to a November 26, 1976 letter from Martin Gunther, the Acting Director of the Division of Methadone Standards and Quality Control (ODAS), to Dr. Harvey Gollance, the Director of Morris Bernstein Institute. That letter, dealing with deficiencies in the Cumberland Hospital OPD Program reads as follows:
"Dear Dr. Gollance:

*"Please refer to Dr. Joseph's telephone conversation earlier this year with you and, I believe, Dr. Trigg. The subject matter of these contacts was the result of the program audit conducted from September 30 to October 4, 1976, which indicated the above-identified OPD was without any physician coverage since December 1975. This situation was aggravated by the fact that there was not even a full-time clinic supervisor, since Mr. Heeny, whose main responsibility was supervision of the Methodist Hospital OPD, could only occasionally, several times during the week, spend a few hours at the Cumberland Hospital OPD.*

"I need not point out to you that the resulting deterioration of the medical treatment services, as reported to this office by my staff, constitutes not only a gross disregard of contractual obligations; the citation of numerous and critical violations of both Federal and State requirements raises serious questions about this OPD as a viable drug-abuse treatment resource. We have discussed in detail the general and specific shortcomings at this OPD during a meeting on October 28, 1976. This meeting was attended by Dr. Freeman and Mr. Maglin from your office and Dr. Gupta and his supervisory staff. This Office was represented by two reviewers, Dr. Yap and Ms. Demirjian, and myself. We were pleased to learn at that time that, following the prompt intervention by the FDA and this Office, Dr. Gupta was appointed as the new medical director and Mr. McManus as the new full-time clinic supervisor.

"It is now requested that you advise this Office within 30 days, in detail, of the steps you have taken to correct each of the cited deficiencies. In case of an unsatisfactory reply or subsequent finding of substantial non-compliance I shall not hesitate to recommend to the Commissioner of the Office of

Drug Abuse Services that ODAS' approval and support of this treatment unit be withdrawn.

Very truly yours,
Martin Gunther"

(Emphasis supplied.)

It is not clear from this record whether the respondent was aware that the Cumberland Program was operating without any physician coverage for a period of over nine months. If the respondent was aware of this gross violation but took no immediate remedial action, then petitioner's argument would be strengthened that the respondent was favoring nonproprietary programs. Even if the respondent was unaware of this most serious violation, it may be reasonably argued that respondent's ignorance in this matter was due to a lack of diligence on his part in policing the nonproprietary area. It is also impossible to determine from this record whether a physician was ever hired by Cumberland and/or whether disciplinary measures were taken against it by the respondent.

Secondly, petitioner stresses that Acting Director Gunther sent a December 29, 1976 letter to Dr. Joyce Lowinson, the Medical Director of Bronx State Hospital, concerning numerous and critical violations in that nonproprietary program. That letter reads as follows:

"Dear Dr. Lowinson:

*"The inspection and program review of the above-identified methadone treatment facility, conducted earlier this year by an interdisciplinary review team from this Office, again indicates violations of State requirements so numerous and critical that the appropriateness of this program to function as a viable methadone treatment resource is seriously in question.*

"Our staff has discussed these deficiencies in detail with Dr. Karavides and other representatives of the clinic and your Office during a meeting on November 8, 1976. At that time, documents listing the violations and shortcomings (FD 483, and ODAS' Reviewers' Observations of Methadone Program Deficiencies) were tendered.

"In accordance with current procedure this Division has forwarded a report of the program's deviations from Federal requirements, 21 CFR 310.505, to the Food and Drug Administration's Division of Methadone Monitoring.

"While it is anticipated that many, if not all, of the listed

deficiencies of Part 2021 have been corrected, it is now requested that you advise this Division in 10 days of the changes that you have implemented in order to achieve compliance. Detailed information on each item is required.

"If you wish to have any additional information, please call this office (488-4259).

Very truly yours,

Martin Gunther
Acting Director"

(Emphasis supplied.)

Again, there is no indication in the record as to whether these "numerous and critical violations" were corrected or whether charges were subsequently served on Bronx State Hospital.

Thirdly, the petitioner submits a March 24, 1976 letter from Dr. Joseph, the Deputy Commissioner of Methadone and Pharmaceutical Control, to Dr. Primm, the Executive Director of the Addiction Research and Treatment Corporation, concerning violations in the Quincy Village Program. That letter reads as follows:

"Dear Dr. Primm:

"In December 1975, Mr. Cooney, NTP Review Specialist from this Office, inspected the above identified facility since it is registered with Federal and State Authorities as a methadone-using drug abuse treatment program. The reviewer was profoundly impressed by Quincy Village's ambitious rehabilitation program, the variety of services provided, the extensive interaction between staff and patients and the strong emotional bonds that apparently develop among· those affiliated with the program for any length of time.

"*It would appear to be a therapeutic community that happens to include a few methadone-maintained residents (at the time of the review, there were five (5) patients). It does not (and indeed cannot be expected to) qualify as a methadone maintenance treatment program. This becomes evident when one studies the long lists of Federal and State violations, which were presented and discussed in detail by Mr. Cooney during his meeting on December 23, 1975 with the director of Quincy Village, Mr. George Brown.*

"Probably it would be more appropriate for your agency to

assign the five rehabilitants who are maintained on methadone to one of your other methadone treatment clinics in Brooklyn (while retaining them as residents at Quincy Village) and withdraw this facility's registration as a methadone maintenance treatment program rather than to try to comply with requirements such as those pertaining to methadone security, on-site physician coverage, medical services, and dispensing and administering of methadone dose under observation by authorized persons (physician, nurse, pharmacist, etc.).

"It is now requested that you advise this Office within thirty (30) days either that you withdraw this program's registration as a methadone treatment facility or report in detail that Quincy Village is now in compliance with regard to each item on the enclosed list of deviations from State requirements.

"If you desire additional information, please call this Office (488-4255).

Very truly yours,

S.Seymour Joseph, M.D."

(Emphasis supplied.)

The record is again silent as to the results produced by that letter.

There is a distinct danger that every licensee, threatened with the revocation of his license, will claim "invidious discrimination" in the hope of obtaining a protracted hearing. The licensee could use the hearing as a "fishing expedition" to harass a particular agency and to discourage its enforcement policies. The courts must be vigilant to reject such unfounded charges of discrimination by a licensee.

However, the petitioner in this proceeding has shown on the limited documentation, grudgingly provided by respondent in the partial disclosure afforded the petitioner, that three nonproprietary programs were not subjected to disciplinary charges but were given the opportunity to correct many flagrant violations. Of course, the factual circumstances in each of those cases may have warranted that type of discretionary action by the respondent. Likewise, it would be unfair to infer that the conditions in the three nonproprietary programs under discussion are typical of those found in all nonproprietary programs. Furthermore, it is quite possible

that the violations in those three programs have long since been corrected.

On the other hand, it remains possible that the violations in those three nonproprietary programs continue without correction. It is totally possible that the respondent has and will continue to discriminate against proprietary programs. The most damaging item submitted by petitioner is respondent's own interoffice memorandum, dated December 1, 1976 to Acting Director Gunther. In that memorandum, respondent states:

*"Although thus far we have instituted legal proceedings against proprietary methadone maintenance clinics only,* I want to leave no doubt that the job of your Division is to assure appropriate standards of care for all methadone maintenance treatment programs, whether run by hospitals, individual clinics or private physicians.

"You can count on my support."

(Emphasis supplied.)

Respondent does not come forward with an explanation to show that his selective enforcement against proprietary programs was based upon a justifiable standard of discrimination *(Matter of Di Maggio v Brown,* 19 NY2d 283, 290). His unexplained admission in the memorandum that, at that point in time, there had been no legal action taken against any nonproprietary programs raises a serious question of possible discrimination that warrants further inquiry by this court.

On the documentation submitted, the petitioner has made a prima facie showing that the respondent might have discriminated in favor of nonproprietary and against proprietary programs. I would hold this article 78 proceeding in abeyance and order a trial forthwith to resolve the many unanswered questions surrounding the central issue of whether there has been invidious discrimination by the respondent (CPLR 7804, subd [h]).

SULLIVAN, J., concurs with FEIN, J.; SILVERMAN, J., concurs in an opinion; MURPHY, P. J., and LUPIANO, J., dissent in an opinion by MURPHY, P. J.

Determination of the respondent, dated August 16, 1977, confirmed, without costs and without disbursements.