OPINION OF THE COURT
Charles E. Ramos, J.
In this CPLR article 78 proceeding petitioners Miramax Films Corp. and Pedro Almodovar challenge the "X” rating given their controversial film, "Tie Me Up! Tie Me Down!” by respondent the Motion Picture Association of America, Inc. (MPAA). They seek a court-imposed modification of the rating from "X” to "R”. The petitioners complain that the classification of "Tie Me Up! Tie Me Down!” as "X” rated runs afoul of the prohibition against arbitrary and capricious conduct (CPLR art 78). It appears that for the first time the courts have been asked to intervene and address issues previously dealt with by film critics and the motion picture industry regarding the fairness and methodology of ratings given films by the dominant film rating organization in this country.
Traditionally, any controversy regarding the content of a motion picture focused on the issues of censorship and free speech, not on the fairness of action taken with regard to a particular film by an industry rating board.
Censorship is an anathema to our Constitution and to this court. The respondent which created and administers the present rating system also proclaims that it is against censorship. However, notwithstanding the denials of censorship by the respondent, the present system of rating motion pictures "G”, "PG”, "PG-13”, "R” and "X” is an effective form of censorship. It is censorship from within the industry rather than imposed from without, but censorship nevertheless.
The repeatedly expressed concern by the MPAA that its rating system is the industry’s only defense to government censorship in unwarranted in light of First Amendment guar *3 antees. The courts of this State and of the United States have sought to articulate a standard which would reconcile the interests that conflict — the preservation of individual liberties and creative freedoms on the one hand, and the protection of legitimate public concerns such as the emotional well-being of our children, on the other. The effort has produced a balancing point, the point at which speech stops and obscenity begins. Justice Brennan stated the present view in Roth v United States (354 US 476, 484 [1957]): "All ideas having even the slightest redeeming social importance — unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion — have the full protection of the guaranties, unless excludable because they encroach upon the limited areas of more important interests. But implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance.”
There is nothing inherent in the rating system that would modify or extend the Roth standard. The standard in Roth (supra) was intended to apply in cases of governmental action to suppress or to prosecute and cannot be imposed upon the MPAA as its standard.
For its part, the MPAA contends that because First Amendment issues are not at stake, its rating determination must stand unless there is overt administrative misconduct. Once there is a finding of no administrative misconduct, the argument goes, its expertise ought to be deferred to as a legitimately authorized and duly constituted administrative body. Omitted from this analysis is the question of the reasonableness of the standard which the MPAA applies. If the MPAA is to avoid the relief sought herein then that standard must be rational, not arbitrary.
Initially, the court notes that there is no serious dispute that the court has the jurisdiction to review a film rating determination of the MPAA in the context of an article 78 proceeding. As shall be further discussed herein, the standard of proof necessary for relief and the method of judicial review is very much in dispute.
Respondent MPAA is a New York not-for-profit corporation and its members are producers and distributors of motion pictures and television programs. It administers a voluntary rating system, Classification and Rating Administration (CARA) which reviews most, if not all, popularly screened films in this country. It is clearly the most significant, to the point of exclusive, film rating system and the tremendous impact of its ratings to the economic viability of a film is undisputed.
*4 Films are submitted to respondent for review by CARA. Films are rated and placed in one of the following categories:
"G” — General Audiences — All ages admitted.
"PG” — Parental Guidance Suggested; some material may not be suitable for children.
"PG-13” — Parents strongly cautioned. Some material may be inappropriate for children under 13.
"R” — Restricted, under 17 requires accompanying parent or adult guardian (age varies in some jurisdictions).
"X” — No one under 17 admitted.
With regard to "Tie Me Up! Tie Me Down!” a seven-member board viewed the film and unanimously determined that the film should be classified with an "X” rating. The board members individually filled out, in their usual course of operations, rating forms which detailed the basis for the "X” rating. Each of the raters found that two sexually explicit scenes warranted giving the film an "X” rating. The board also found the visual depiction of the sex acts and language accompanying one scene to justify an "X” rating.
Petitioners were afforded an opportunity to delete or edit the objectionable scenes and declined. An appeal of the ruling was heard by the rating appeals board which split down the middle on whether the film warranted an "X” rating. As a two-thirds vote of the appeals board is required to reverse the underlying determination, the "X” rating was upheld.
Petitioners point to no deviance from standard procedures of the MPAA in the rating of the film.
The court notes that at any time a producer may withdraw a film from consideration by respondent and distribute the film unrated. The negative economic impact of not obtaining a satisfactory rating is clear and severe. Petitioners chose to distribute the film unrated.
The MPAA’s standard for rating films was described in a memo to the rating board members from the chair of CARA, Mr. Richard D. Heffner. In that memo Mr. Heffner states that the MPAA rates films "as we honestly believe most American parents will want us to”. It is evident that the MPAA standard is to rate films "G” through "X” based upon the tastes of the average American parent (AAP). The stated purpose of the rating system is "to provide advance information to enable parents to make judgments on movies they wanted their children to see or not to see” (Valenti, The Voluntary Movie Rating System, at 4 [MPAA 1987]). As such the MPAA rating system is clearly not designed to rate the merits of a film or *5 even to advise adults as to which films they may wish to see.
The MPAA’s list of cinematic no-nos is predictable: language, violence, nudity, drug use and sex. Notably absent is any sensitivity to the offenses suffered by women, minorities, the disabled and those who may not share the values of the AAP.
This court cannot avoid the notion that the standard is reasonable only if one agrees with it. This standard, by definition, restricts material not because it is harmful, but because it is not average fare.
There is a breach between the standard for protected speech in Roth (supra) and material which the rating board finds acceptable that is wide indeed. Into that breach step those who would create and distribute motion pictures. The manner in which the MPAA rates all films, not just “Tie Me Up! Tie Me Down!” causes this court to question the integrity of the present rating system.
The court notes that the initial rating board and the Ratings Appeals Board members have no special qualifications. “There are no special qualification for Board membership, except one must have a shared parenthood experience, and one must love movies, must possess an intelligent maturity of judgment, and have the capacity to put himself or herself in the role of most parents and view a film as most parents might — parents trying to decide whether their younger children ought to see a specific film.” (Valenti, The Voluntary Movie Rating System, at 5 [MPAA 1987].)
Petitioners allege in conclusory fashion that the board members and Ratings Appeals Board are selected and subject to the control of the major motion picture producers and distributor establishment. This court is unable to address this issue because no attempt at offering a factual underpinning for such allegations has been made.
An even more substantial concern is the question, not addressed by the parties, of whether respondent is adequately meeting the needs of America’s children in film rating. Having voluntarily taken on this responsibility there may well be the obligation to competently address the task. An often leveled criticism of the MPAA is that violence in films is condoned to a far greater extent than displays of sexual activity. Without professional guidance or input it may well be that the interests of children are not adequately protected or are even endangered by providing color of acceptability to extremely violent and psychologically damaging films.
Although each of the categories which the rating system *6 uses is cloaked in terms which suggest that they are fashioned to protect America’s children, the inference of concern for the welfare of children is not borne out by any scrutiny of the standard and the guidance given to the rating board members. The standard is not scientific. There are no physicians, child psychiatrists or child care professionals on the board, nor is any professional guidance sought to advise the board members regarding any relative harm to minor children. No effort is made to professionally advise the board members on the impact of a depiction of violent rape on the one hand and an act of love on the other, nor is any distinction made between levels of violence. In this regard, the court notes the following from Mr. Heffner’s December 1988 memo to rating board members: "Be concerned about violence, for American parents increasingly are * * * but remember always how much violence seems to be accepted, perhaps even expected, in television and films.”
Excerpts of Valenti’s description of what the ratings indicate are probative of the relative tolerance with which violence in films is permitted related to material of a sexual nature:
"R: 'Restricted, under 17 requires accompanying or adult guardian’ (Age varies in some jurisdictions) * * *.
"The language may be rough, the violence may be hard, drug use content may be included, and while explicit sex is not to be found in R-rated films, nudity and lovemaking may be involved * * *.
"X: 'No one under 17 admitted’ * * *.
"The reason for not admitting children to X-rated films can relate to the accumulation of sexually connected language or of explicit sex, or of excessive and sadistic violence”. (Valenti, The Voluntary Movie Rating System, at 8 [MPAA 1987].)
Thus, the MPAA rates films on a purely subjective basis of what they believe is the AAP criteria for their children. A film may be viewed by children that may contain "hard violence” and "drug use” but not "explicit sex”. Only "excessive and sadistic violence” will result in an "X” rating. It may well be that the MPAA ratings are skewed towards permitting film makers huge profits pandering to the appetite for films containing "hard violence” and "drug use” while neglecting the welfare of children intended to be protected by the rating system. This court concludes that reliance upon a nonprofessional rating board is misplaced and that the effort by the MPAA to encourage a more lenient policy toward violence is indefensible.
The failure of the rating system to provide a professional *7 basis leaves only the viewing taste of the AAP, the consumers, as the standard. This standard may serve as a basis for a successful marketing strategy but may not coincide with the advice child care professionals might offer.
It may make good business sense not to ask a question if you might not like the answer, but it does render as hypocritical Mr. Heffner’s claim that the sole rationale for the "X” rating is to avoid psychological abuse of children. The industry that profits from scenes of mass murder, dismemberment, and the portrayal of war as noble and glamorous apparently has no interest in the opinions of professionals, only the opinions of its consumers.
The record also reveals that films are produced and negotiated to fit the ratings. After an initial "X” rating of a film whole scenes or parts thereof are cut in order to fit within the "R” category. Contrary to our jurisprudence which protects all forms of expression, the rating system censors serious films by the force of economic pressure. The MPAA requires that American films deal with adult subjects in nonadult terms, or face an "X” rating. Films shown under the present system tend to be restricted to those fit for children under 17, as defined by the AAP.
The heart of petitioners’ grievance is that an "X” rating stigmatized their film and lumped it into a category with pornographic films which none of the parties or serious critics contend should be done. Petitioners wish the court to award an "R” rating or alternatively seek to have the court determine that the rating system itself is patently arbitrary and capricious or without rational basis.
At its inception, the rating system denoted the various levels by the use of symbols and registered those symbols as trademarks, with the notable exception of the "X” rating. The effect of that exception (not explained in the papers submitted or during oral argument) has been to permit those who characterize themselves as pornographers to appropriate the "X” rating for their own purposes. "X rated” is now synonymous with pornography. For a film not intended for the pornography market, the rating of “X” is a stigma that relegates the film to limited advertising, distribution and income.
While it may be true that the MPAA has permitted the “X” rating to be appropriated by the pornography industry with a concomitant tainting of any film awarded an "X” rating, petitioners do not allege any bad faith or foresight in respondent’s failing to register the “X” rating. While arguing in conclusory fashion that the current system works to the *8 detriment of certain types of films and film makers, petitioners do not set forth an adequate factual basis on the papers before this court, or oral argument, to warrant such findings.
The court notes that it is clearly precluded in judicial review from substituting its judgment for that of the body reviewed or from considering the facts de novo (see, Matter of Colton v Berman, 21 NY2d 322; Matter of Clancy-Cullen Stor. Co. v Board of Elections, 98 AD2d 635; Matter of Kayfield Constr. Corp. v Morris, 15 AD2d 373). This principle will also apply to a review of a determination of a private nongovernmental organization (see, Matter of Levandusky v One Fifth Ave. Apt. Corp., 75 NY2d 530). This court is also precluded from imposing a different (professional) standard because the MPAA may not be required to do so under the First Amendment. Therefore, the burden is on petitioners to set forth facts indicating that respondent acted arbitrarily, capriciously and without rational basis in applying the standard of the AAP. This petitioners have clearly failed to do. Within the context of this rating system for parental guidance there has been no showing that the "X” rating afforded "Tie Me Up! Tie Me Down!” was without a rational basis or arbitrary and capricious. Petitioners themselves acknowledge that the film contains material that is not suitable for those under the age of 18 and there is no dispute that the film contains language and sexually explicit scenes that parents might not wish their children to view.
As a part of this proceeding, the court has been requested to view selected scenes from "Tie Me Up! Tie Me Down!” and scenes from other films rated "R” in order to determine if the "X” rating was arbitrary. That determination this court declines to make.
This court will not dignify the present system by rendering an opinion on so frivolous a standard as the wishes of the AAP. What is offensive is the unprofessional standard itself, not the manner in which the rating board applies it. The standard of the AAP is a marketing standard, a tool to aid in promoting films. There is no basis in the record for the court to conclude that the MPAA does not know how to label its products for market, there is only a question as to the significance of the labeling.
At best the offering of clips of "R” rated films into evidence amounts to an argument of discriminatory enforcement of the rating standards. That over the course of more than two decades a handful of films may have been as sexually explicit *9 as "Tie Me Up! Tie Me Down!” or arguably, in the eyes of the beholder, more explicit and unsuitable for youthful viewers and have obtained an "R” rating is not inherently arbitrary and capricious or without rational basis. To find respondent’s actions of affording the "R” rating to certain films and not to "Tie Me Up! Tie Me Down!” to be wrongful, the court believes petitioners need offer evidence of clear and intentional discrimination (see, Matter of Di Maggio v Brown, 19 NY2d 283). Petitioners have failed to do so. Merely alluding in conclusory fashion to possible vague discrimination is not sufficient. Additionally, the overriding concern is whether respondent acted in good faith in furtherance of its own legitimate purpose (see, Matter of Levandusky v One Fifth Ave. Corp., 75 NY2d 530, supra). Petitioners do not, other than by cursory conjecture, substantiate any basis to indicate respondent acted in bad faith or outside of its stated function in its rating of "Tie Me Up! Tie Me Down!”
There are also questions of the good faith of the petitioners in instituting this proceeding. As aforesaid, the allegations of economic prejudice and discrimination are unsubstantiated and the exploitation of the "X” rating by the petitioners in their advertising and their refusal to cooperate in the review process until after they had physical possession of the "X” certificate leads to the inference that this proceeding may be just publicity for "Tie Me Up! Tie Me Down!”
Petitioners, without a shred of substantiation, contend that respondent may be motivated by a prejudice towards foreign films as well as a prejudice towards independent distributors. Such allegations, in the form of conjecture and wholly conclusory in nature, will not provide a basis for relief or even an evidentiary hearing (see, Matter of Cannon v Urlacher, 155 AD2d 906; Gagnon v Board of Educ., 119 AD2d 674; Matter of Feigman v Klepak, 62 AD2d 816). However, the court notes, and respondent should be guided accordingly, that should such discriminatory practice be substantiated in the context of an article 78 proceeding or a plenary action by such a subject discriminated group of film makers, based upon restraint of trade or intentional interference with . prospective economic advantage, there may well prove to be a basis for relief.
This court is mindful of constitutional limitations on the imposition of a governmental system of censorship (see, Interstate Circuit v Dallas, 390 US 676). The courts would thus be reluctant to tamper with a voluntary independent system of film rating. However, in view of the dominant and preemptive *10 role played by the MPAA in the film industry there is an obligation to administer the system fairly and with a foundation that is rationally based. This proceeding has raised certain issues which need be addressed by respondent although no relief may be afforded herein. The initial problem is the need to avoid stigmatizing films of an adult nature, which ought not be seen by children, but which are clearly not pornographic. The MPAA, having acquiesced in the use of the "X” rating by the pornography industry, may well have some affirmative responsibility to avoid stigmatizing films with an "X” rating.
This court also concludes that the rating system’s categories have been fashioned by the motion picture industry to create an illusion of concern for children, imposing censorship, yet all the while facilitating the marketing of exploitive and violent films with an industry seal of approval.
While the petition before this court does not adequately present a case for addressing these serious issues, it appears that the MPAA should strongly consider some changes in its methods of operations to properly perform its stated mission. Unless such concerns are meaningfully dealt with, the MPAA may find its rating system subject to viable legal challenge by those groups adversely affected herein, including organizations charged with the responsibility of protecting children.
If the MPAA chooses to rate films for the benefit of children it is its duty to do so with standards that have a rational and professional basis or to leave the task to others whose interests are not subject to the powerful economic forces at work within the industry. The respondent is strongly advised either to consider proposals for a revised rating system that permits of a professional basis for rating films or to cease the practice altogether. The petition before this court is, however, not the appropriate vehicle to afford such relief.
Accordingly, the petition is dismissed and the relief sought denied.