**In re CROTON RIVER CLUB, INC., Debtor.**

**No. 93 Civ. 2451 (GLG).**

United States District Court, S.D. New York.

Oct. 22, 1993.

---

Barbara Balaber–Strauss, White Plains, NY, Chapter 7 Trustee, for appellees.

Shea & Gould by Joseph Ferraro and Joseph M. Vann, New York City, for appellants Half Moon Bay Homeowners Association, Inc., Steven Blust, David Cohen, Mable Fischella, Stanley Teller, Brian Trainor, Andre VanSchaffen and Ed Zafrewski.

Pryor, Cashman, Sherman & Flynn by Joseph Z. Epstein, New York City, for appellant FDIC.

### MEMORANDUM DECISION

GOETTEL, District Judge.

This bankruptcy appeal arises from an adversary proceeding brought by debtor-appellee Croton River Club, Inc. ("CRC") seeking a declaratory judgment that the amount it was allocated to pay by appellants, Half Moon Bay Homeowners Association and its Board members, was invalid and improperly set.

## I. FACTS

CRC was the sponsor and developer of Half Moon Bay, a multi-use condominium development located in the Village of Croton–on–Hudson. Half Moon Bay Homeowners Association, Inc. ("Association") was created by the debtor to hold, manage and maintain Half Moon Bay's common areas.

CRC's original plans called for the construction of 342 residential units, a marina consisting of 300 boat slips and a restaurant. Each homeowner and boat slip were allocated one membership in the Association.

In 1990, a dispute arose between CRC and its principal lender. Although efforts were made to negotiate a resolution, no new funding was made available and efforts to refinance the debt or locate a purchaser or equity participant proved futile. At that time, construction of 71 of the first 120 residential units had been completed, and the units had been conveyed to purchasers.

The original Association by-laws issued in 1987 provided that Association charges payable by the marina members would be calculated as 37% of common charges. The by-laws were subsequently amended several times to change the percentage. In March of 1989, the by-laws were amended to require a 14.25% allocation. However, the initial offering plan provided that the sponsor would subsidize Association operations and that sponsor subsidization would gradually decrease as additional phases of construction were completed.

On February 14, 1991, the debtor was forced to file a Chapter 11 petition. CRC was continued in management and possession of its property and business in accordance with 11 U.S.C. §§ 1107 and 1108. At that time, construction had been completed on all of the first 120 residential units and 162 boat slips.

Pursuant to an order of the bankruptcy court dated July 3, 1991, CRC sold its interest in the residential units to HMB Acquisition Corporation ("Acquisition"). CRC retained its ownership of the marina and the parcel of land on which the restaurant was to be built. The Federal Deposit Insurance Corporation ("FDIC") holds a first mortgage on the marina and restaurant parcel in excess of $6.5 million.

Prior to the bankruptcy filing, the Half Moon Bay Homeowners Group ("the Group"), which is comprised of residential owners, commenced a derivative action in New York Supreme Court against, *inter alia*, the debtor, the Association, and individual members of its board for the alleged failure to comply with the Half Moon Bay offering and the board's alleged breach of its fiduciary duties.

On July 1, the Group's state court suit was settled by stipulation which was so ordered by the bankruptcy court on July 3, in which CRC and Acquisition agreed that CRC's designees to the Association Board ("the Board") would not serve as president or vice-president and that allocations under the control of the Association would be decided by a vote of the homeowners-in-residence. Although the original stipulation purported to exclude the allocations of expenses to the marina parcel, the stipulation was amended by an order dated January 24, 1992 submitted by the debtor which changed the word "excluding" to "including."[1]

In addition to the possible injury to the FDIC's rights, CRC's decision to allow the Association to set the marina allocation was significant because, although 120 residential units were eventually sold (71 prior to bankruptcy and 49 in bankruptcy), none of the homeowners ever bought boat slips. Unable to find outside buyers, CRC retained ownership of the boat slips and their corresponding Association memberships. Although CRC rented the slips, few homeowners were among the renters, and the lack of identity between slip owners and homeowners re-

---

1. The Debtor and the Association claim that the use of the word "excluding" rather than "including" was inadvertent. However, the FDIC asserts that the original wording of the settlement was purposeful because, unlike other aspects of the Association's expenditures, the Debtor did not have the power to give up control of the marina allocation since such a change would have a severe impact on the FDIC's security interest.

In support of this position, the FDIC has submitted the affidavit of Arthur Steinberg, who represented CRC during the negotiations. Steinberg states that two hours were spent reviewing the original stipulation before it was signed.

Although the FDIC never objected to the stipulation, Steinberg states that as far as the FDIC was concerned the operative word was excluding rather than including. Further, the FDIC maintains it never approved of the changed version of the stipulation, nor would it have since any material alteration in the marina budget allocation could destroy the value of the marina as a saleable asset.

moved any incentive the homeowners would have had to keep the marina assessment down.

After the stipulation was signed, relations between the Debtor and the homeowners continued to be rocky. In August of 1991, the Group offered to buy the marina for $750,000. The offer was refused as inadequate. David Cohen, President of the Association Board, also made several offers to buy the marina but was rejected.

CRC maintains that some Board members, believing that Acquisition was not upholding its obligations under the stipulation, took action through the Association to prevent closing on the 49 units which were sold through the bankruptcy. CRC claims that these actions adversely effected its creditors who were to receive payment from Acquisition upon closing. It also maintains that the negative publicity prevented or interfered with its ability to attract new slip renters.

In November 1991, the Association's managing agent, Garthchester Realty Ltd., prepared the 1992 budget and allocated $19,000 as the marina allocation, which is the sum of the individual assessments to each of the marina shares. This figure reflected the marina's historic contribution of 14.25% of the common costs. However in December of 1991, the Association made an allocation of $160,324 or 53% of the common charges.

According to the affidavit of CRC's vice-president Susan Hanna, in 1991 and 1992, CRC anticipated annual revenues of $278,000 and expenses of $158,000 before debt service, real estate tax and payment of the Association allocation. Thus, if CRC paid the $160,-324 assessment, it would have a cash deficit of approximately $40,000 before debt service and real estate taxes.

The Debtor brought this adversarial proceeding against the Association, the Association's Board members, Steven Blust, David Cohen, Mable Fischella, Stanley Teller, Brian Trainor, Andre Van Schaffen and Ed Zafrewski, and the FDIC to obtain a declaratory judgment that the Board breached its fiduciary obligations by acting in an arbitrary, capricious, unfair or biased manner when it fixed the marina allocation. The Debtor sought to have the bankruptcy court invalidate the allocation, set a new allocation and award compensatory, and punitive damages.

The Association and the individual defendants moved for summary judgment pursuant to Bankruptcy Rule 7056 which incorporates Fed.R.Civ.P. 56. They claimed that the bankruptcy court was barred from considering the reasonableness of the allocation by the business judgment rule which they contend bars judicial inquiry into a board's decision absent a showing of bad faith. The Debtor cross-moved for summary judgment on the limited issue of whether the business judgment rule applied. The FDIC opposed the motion to the extent that it or any purchaser at a judicial sale would be bound by the Association's allocation.[2]

Pursuant to Bankruptcy Rule 7012(b) which incorporates Fed.R.Civ.P. 12(b), the Association and the individual defendants also moved to dismiss Debtor's third cause of action which alleged interference with its ability to attract users and buyers to the marina and to dismiss the complaint in its entirety with respect to a derivative claim brought on behalf of the Association shareholders.

Finally, the Association and the individual defendants moved for judgment on their counterclaim which sought payment of the $160,324 allocation.

The bankruptcy court granted the Association and the individual defendants' motion to dismiss the third cause of action and derivative claim. However, it denied their motion for summary judgment and judgment on the counter-claim. Finally, the bankruptcy court granted the Debtor's motion for partial summary judgment holding that a reasonableness standard applied to the marina allocation rather than the business judgment rule. 145 B.R. 185.

---

2. The FDIC argued that it was not a party to the settlement agreement and thus could not be bound by the Association's allocation *regardless* of whether the allocation was reasonable. Thus, the FDIC claimed should it obtain the marina parcel through foreclosure, it would be subject to a 14.25% allocation as stated in the by-laws.

The bankruptcy court subsequently held an evidentiary hearing where it held that 53% was not a reasonable allocation and reinstated the 14.25% figure. By order dated December 3, 1992, it stated that the marina allocation for 1992 was fixed at 14.25% of the total of the Association's expenses for (1) office expense, (2) maintenance repair and supply, (3) landscaping, (4) snow removal, (5) security, (6) extermination (limited to the marina office in the Hudson House), (7) telephone (consistent with HOA's 1992 allocation) and (8) contingencies for the above. The order also stated that it was issued without prejudice to

> the FDIC's position that the Marina Allocation set by the Court in this Order, or by the [Association], is not binding on it, unless it consents to such Allocation or unless such Allocation is consistent with the allocation set forth in the Offering Plan, and is without prejudice to any further application the FDIC might make.

After the evidentiary hearing, the bankruptcy was converted from Chapter 11 to Chapter 7 and the Trustee was substituted as the real party in interest.

The Association and the individual defendants ("appellants") now appeal both the bankruptcy court's decisions denying summary judgment and allocating common charges.

The FDIC also appeals claiming that the bankruptcy court erred in failing to deny the non-FDIC defendants' summary judgment motion on the ground that the FDIC, or any subsequent purchaser through a foreclosure sale, is not bound by the settlement agreement and thus not bound by any allocation the Association may set.

## II. ANALYSIS

██ As this is an appeal from a final judgment, this court has appellate jurisdiction pursuant to 28 U.S.C. § 158. In reviewing the decision below, we note that we must accept the bankruptcy court's findings of fact unless clearly erroneous, but that its legal conclusions are reviewed under a *de novo* standard. Fed.R.Bankr. 8013; *In re Chateaugay Corp.*, 104 B.R. 637 (S.D.N.Y.1989).

Appellants assert three bases for their appeal. First, they argue that the bankruptcy court erred in applying a reasonableness standard rather than the business judgment rule in its review of the Board's allocation. Second, they contend that the bankruptcy court denied them a fair evidentiary hearing by "pre-judging issues and by excluding admissible evidence." Finally, they assert that the bankruptcy court erred in making its own allocation of common charges.

### A. *Applicability of the Business Judgment Rule*

██ The New York Court of Appeals has held that the business judgment rule furnishes the correct standard of review for decisions of board of directors of residential corporations. *Levandusky v. One Fifth Ave. Apartment Corp.*, 75 N.Y.2d 530, 554 N.Y.S.2d 807, 553 N.E.2d 1317 (1990). Generally, the business judgment rule "prohibits judicial inquiry into actions of corporate directors 'taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes.'" *Id.* at 537–38, 554 N.Y.S.2d 807, 553 N.E.2d 1317, *quoting Auerbach v. Bennett*, 47 N.Y.2d 619, 629, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979).

The *Levandusky* court reasoned that the business judgment rule protects the board's decision from indiscriminate attack, but at the same time

> it permits review of improper decisions, as when the challenger demonstrates that the board's action has no legitimate relationship to the welfare of the cooperative, deliberately singles out individuals for harmful treatment, is taken without notice or consideration of the relevant facts, or is beyond the scope of the board's authority.

*Levandusky* at 540, 554 N.Y.S.2d 807, 553 N.E.2d 1317.

Based on this language, the bankruptcy court found that the Association board's action singled out the Debtor for harmful treatment and thus was subject to review. It wrote

> [t]his is not a situation where the [Association] Board made a decision to be applied

uniformly to all of its shareholders. The [Association] Board has singled out the debtor, as the owner of the Marina, for harmful treatment. By increasing the Marina Allocation from approximately $19,000.00 to $160,000.00, after unsuccessfully attempting to purchase the Marina, the decision by the HOA Board can be interpreted in no other way.[3]

After finding that the business judgment rule did not apply, the bankruptcy court held that an evidentiary hearing was necessary to determine whether the allocation was reasonable.

Appellants claim that the bankruptcy court misapplied *Levandusky*. They claim that they simply fixed common charges to be paid by class membership irrespective of the fact that all of the marina memberships are owned by the debtor and that CRC is obliged to pay its share of common charges because it owns all 162 Association memberships attributable to the marina. Appellants assert that to hold such an action singles out a certain entity would be to hold that the business judgment rule cannot apply whenever an action only affects a certain class of stock which is solely held by a single entity.

Appellants also argue that CRC, as the corporate owner of several units, should not be construed as an individual under *Levandusky*. In support of their position, appellants note that the cases following *Levandusky* have only applied the "singled out" exception where an individual shareholder was subject to racial bias or where the board discriminated against a shareholder in the application of an otherwise uniform policy. *See Ackerman v. 305 East 40th Owners Corp.*, 189 A.D.2d 665, 592 N.Y.S.2d 365 (1st Dep't 1993); *Faiola v. JAC Towers Apartments, Inc.*, 147 Misc.2d 630, 558 N.Y.S.2d 478 (1990). Finally, appellants argue that CRC is already receiving more favorable treatment as the marina memberships are being allocated a lower percentage of the common charges than the homeowners memberships.

While we note that the situation at hand is distinguishable from the cited cases applying the "singled out" exception, we think that appellants' argument elevates form over substance. There is no dispute that the marina units were accorded a different class of membership in the Association than the residential units and as such could properly be accorded a different allocation than the residential units. There is also no dispute that the Association uniformly allocated each marina membership its 1/162 share of the marina's 53% allocation of the common costs. The crucial issue here is not the fact that the marina memberships were given a different allocation than the homeowner membership but the fact that Debtor was singled out for harmful treatment.

The reasoning behind the exception stated in *Levandusky* is that a cooperative board should not be able to hide behind the business judgment rule to shield improper decisions. Unlike decisions of general application, decisions which single out individuals for harmful treatment are viewed with scrutiny because such actions are more likely to be motivated by prejudice, and because individual shareholders are less able to challenge unfavorable board decisions.

Applying this rationale, we find that the bankruptcy court properly held that the marina allocation was not protected by the business judgment rule. First, despite the fact that the allocation was assessed against all the marina memberships, all the memberships were owned by the Debtor thus suggesting that there may have been discriminatory intent behind the Board's actions. Second, because directors elected or designated by the marina members did not vote on the marina allocation, the Debtor was powerless to influence the allocation assigned to the marina memberships increasing the danger of overreaching on the part of the Association Board. Thus, we affirm the bankruptcy court holding that, because the Debtor was singled out for harmful treatment, the marina allocation should be reviewed under a reasonableness standard.

**3.** The Trustee reports it has received an independent offer to buy the marina for $550,000 cash on the condition that the allocation remain at 14.25%. The Trustee argues that HOA's high allocation is part of a plot to sabotage the sale of the marina to a third-party.

## B. *Reasonableness*

The bankruptcy court held an evidentiary hearing on the issue of the reasonableness of the allocation on November 5 and 6, 1992. Ruling from the bench, Judge Schwartzberg found the 53% allocation unreasonable. He stated, "I am satisfied based upon the evidence adduced that a 53% allocation to the marina is totally unrealistic and may not be used in this case." Judge Schwartzberg went on to find that several items included as a common expense should not have been attributed to the marina[4] and held that a 14.25% allocation would continue "as originally set in its last determination by the bylaws of the sponsor, and that the line items previously referred to shall be the line items included with respect to which the allocation shall apply."

On appeal, appellants argue that they were denied a fair hearing. They assert that the bankruptcy court pre-judged issues and excluded relevant evidence. They base their assertion on the fact that Judge Schwartzberg stated that he thought the 53% allocation was "totally out of line" during the testimony of David Cohen, appellants' first witness and made other statements indicating that he did not believe that 53% was a reasonable figure and "accused counsel for appellants of wasting the Court's time" when appellants tried to show that the 14.25% figure proposed by CRC itself was unreasonable and arbitrary. As a result, Judge Schwartzberg refused to admit the formulas and allocations CRC used to fix its allocation except for historical comparison, and refused to allow appellants to show the results of applying CRC's methodology and formulas to the present Association budget.

■ The Trustee argues that Judge Schwartzberg's comments during Cohen's testimony did not reflect "prejudging."

Rather, she asserts the comments illustrated that Judge Schwartzberg may have viewed Cohen as a biased witness.[5] Also, prior to the hearing, Judge Schwartzberg had considered the testimony, briefs, depositions and papers submitted with the summary judgment motion which may have made him critical of the 53% figure. We agree with the Trustee. As a reviewing court, we cannot say that Judge Schwartzberg's open expression of skepticism over the 53% figure illustrated improper bias rather than the fact that he was intimately familiar with the record and made a judgment, as the finder of fact, that Mr. Cohen's testimony was not credible.

■ As to appellants' second argument, a perusal of the record shows that Judge Schwartzberg sought to exclude the additional evidence submitted by the appellants because he felt that formulations and allocations used by the Debtor which were not adopted by the Board were irrelevant to the determination of whether or not the 53% figure was reasonable. Indeed, Mr. Cohen specifically stated that the Board looked at the allocations and formulas and decided that "since there was no consistent way of having these presented that we would have to look to a different method."

When considering the issue of the admissibility of the Debtor's prior allocations and formulas, Judge Schwartzberg stated:

> [m]y ruling was that ... it was not relied upon for purposes of coming up with the [Board's] allocation because otherwise you can go through a plethora of items which were not relied on. But if it is put in solely for the purpose of showing what the historical context was, then for that purpose it generally is background as allowed.

---

4. The items included 1) the $41,495 salary of the manager and superintendent of the condominiums, 2) accounting, management, legal and office expenses, 3) rubbish removal, 4) pool expenses, 5) ADT for burglar and fire alarm, 6) franchise corporate tax and 7) insurance, water, gas and electricity.

5. Indeed on cross examination, Cohen admitting writing a letter to David Portman, the outside

consultant hired prior to the allocation, which stated that the Board's position to be that

> the Marina allocation [be] calculated by taking the existing condos (120) and the existing slips (162) and figuring them as a percentage of total use. The Marina has 57% of the site and should pay 57% of the budget. This works out to approximately $257,000 ... What we are looking for is the highest justifiable allocation for the HOA.

We agree with Judge Schwartzberg that the Debtor's prior allocations and formulas were not relevant to the issue of whether the Board's 53% allocation was reasonable. Because we find that Judge Schwartzberg properly excluded evidence and did not display wrongful bias in the evidentiary hearing we affirm his finding that the 53% allocation was unreasonable.

### C. Propriety of Setting the New Allocation

█ Appellants final argument is, even if Judge Schwartzberg correctly held that the 53% allocation was unreasonable, he did not have the power to set the 1992 allocation at 14.25%. Instead, they contend, he should have allowed the Association to come up with a new allocation once the 53% was set aside as unreasonable. Conversely, if Judge Schwartzberg had the power to set the new allocation, appellants argue that he should have allowed them to submit proof that the 14.25% figure was unreasonable.[6]

In support of their position, appellants cite *Miramax Films Corp. v. Motion Picture Ass'n of America, Inc.*, 148 Misc.2d 1, 560 N.Y.S.2d 730 (1990). In *Miramax*, a film-maker brought an Article 78 proceeding seeking to have the New York Supreme Court modify the rating imposed by the Motion Picture Association of America from an "X" to an "R." The court denied the petition but, citing *Levandusky*, noted that it was "clearly precluded in judicial review from substituting its judgment for that of the body reviewed or considering facts *de novo*. This principle will also apply to a review of a determination of a private non-governmental organization." *Id.* 560 N.Y.S.2d at 734 (citations omitted).

At the hearing, Judge Schwartzberg took the position that, should he find the 53% figure unreasonable, he could either tell the Board to set a new allocation or, if there was sufficient evidence on the record, set the figure himself. According to the transcript,

he stated, "if I determine that the [53% is] totally unreasonable, I can reject everything. And whether I have authority to make up my own figure depends upon what evidence I have, if there's sufficient evidence here to warrant an alternative figure."

However, in setting the allocation, he stated,

> unless and until a better allocation is established I will go along with the allocation considered by the sponsor when the plan was originally proposed, and the allocation should be on the basis of 14.25%. This seems to be reasonable and set by neither party, and seems to be consistent with what the industry will allow.

He later added, "an allocation of 14.25% shall continue as originally set in its last determination by the bylaws of the sponsor."

Thus, it appears rather than setting the allocation himself, Judge Schwartzberg simply held that the 53% allocation was unreasonable. Because the Association bylaws which set the marina allocation at 14.25% on March of 1989 have not been amended, absent the proper exercise of the Board's power to set a reasonable allocation, which was given to the Board by CRC in the July 1991 stipulation, the allocation figure returns to 14.25% consistent with the bylaws. Because we find that Judge Schwartzberg simply struck down the 53% allocation which automatically reinstated the 14.25% figure, rather than setting the allocation himself, we need not reach whether or not Judge Schwartzberg would have had the power to set a new allocation had there been sufficient evidence on the record.

### D. FDIC's Appeal

The FDIC appeals the bankruptcy court's decision in that it decided the allocation consistently with the settlement agreement. While the FDIC agrees that 14.25% is the proper amount for the marina allocation, its position is that neither the FDIC nor any

---

6. Appellants also argue even if Judge Schwartzberg had the power to set a new allocation, there is no support on the record for his adoption of a 14.25% allocation other than the fact that it had been adopted by CRC in the by-laws. Because the bankruptcy court subsequently adopted a 14.- 25% allocation, apparently based upon the fact that it had historically been used, appellants contend that they should have been able to submit evidence challenging the process by which CRC originally came up with the percentage.

purchaser at a foreclosure or judicial sale should be bound by the settlement agreement. According to the FDIC, because it was not a party to the agreement and because the agreement did not purport to bind the FDIC nor subsequent purchasers at a judicial sale, its rights and obligations continue to be fixed in the by-laws which set the marina allocation at 14.25%.

According to FDIC, the issues to be determined on appeal are 1) whether the bankruptcy court erred in failing to deny the non-FDIC defendants' summary judgment motion specifically on the ground that the FDIC or any purchaser at a judicial sale is not bound by the settlement agreement or any marina allocation which the Association may set and 2) whether this court should direct summary judgment dismissing this adversary proceeding as to the FDIC on the ground that it and any purchaser at a judicial sale is not bound by the settlement agreement or by any marina allocation which the Association may set.

As to the first issue, Judge Schwartzberg denied the non-FDIC defendants' motion for summary judgment. Subsequently, he held an evidentiary hearing at which the 53% allocation was held unreasonable which led to a reinstatement of the 14.25% allocation. To the extent that the FDIC argues that the 53% allocation was improperly substituted for the 14.25% allocation, the motion has already been decided in its favor. We see no reason to review the issue of whether the 53% allocation was improper on the additional ground that the FDIC was not a party to the settlement agreement at which the Association was given the power to fix the marina allocation, especially in light of the fact that the bankruptcy court specifically stated that it did not reach the issue.

As to the second issue, the FDIC cites *Weber v. Dell*, 804 F.2d 796, 798 (2d Cir. 1986), *cert. denied*, 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987), for the proposition that a court may, on appeal, *sua sponte* direct the court below to issue summary judgment for the nonmoving party. While this may be true, we think that the issue of whether, upon foreclosure, the FDIC or a subsequent purchaser would be bound by the settlement agreement is premature. Therefore, we find no reason to direct the bankruptcy court to issue summary judgment on this issue at present.

In summary, the bankruptcy court's decisions to grant summary judgment on the issues of the applicability of the business judgment rule and the allocation of common charges are affirmed in full.

SO ORDERED.