In re Michael and Joanne
STELLUTI, Debtors.

NAVISTAR FINANCIAL
CORPORATION,
Plaintiff,

v.

Michael Anthony STELLUTI and
Joanne Stelluti, Defendants.

Bankruptcy No. 93 B 20870 (HS).
Adv. No. 93–5277A.

United States Bankruptcy Court,
S.D. New York.

May 17, 1994.

White & Case (Andrew P. DeNatale, John S. Willems, J. Christopher Shore, of counsel), New York City, for plaintiff Navistar Financial Corp.

Harold, Salant, Strassfield & Spielberg (Leonard I. Spielberg, of counsel), White Plains, NY, for debtors/defendants.

## MEMORANDUM DECISION DETERMINING NON–DISCHARGEABILITY OF DEBT

STUART M. BERNSTEIN, Bankruptcy Judge.

The defendants, husband and wife, filed a voluntary joint petition under Chapter 7 on April 30, 1993. On July 21, 1993, the plaintiff, Navistar Financial Corporation ("Navistar"), filed this adversary proceeding against the Debtors, objecting to their discharge under Section 727 of the Bankruptcy Code, and seeking a determination of the non-dischargeability of the Debtors' debt to Navistar under Section 523.

Thereafter, Navistar moved for summary judgment on its claims asserted under Section 523(a)(4) and (a)(6) of the Bankruptcy Code. In his decision dated February 3, 1994, and as discussed more fully below, Bankruptcy Judge Schwartzberg granted the motion as to Michael Anthony Stelluti ("Michael"), but denied it as to Joanne Stelluti ("Joanne"). *Navistar Financial Corporation v. Stelluti (In re Stelluti)*, 163 B.R. 699 (Bankr.S.D.N.Y.1994). The Court ruled that issues of material fact existed regarding Joanne's intention or state of mind and her fiduciary relationship to Navistar.

On April 14, 1994, the Court conducted a bench trial on the remaining issues involving the dischargeability of Joanne's debt to Navistar. The Court concludes, from the evidence presented, that a portion of Navistar's claim against Joanne, in the sum of $480,000.00, is not dischargeable under Section 523(a)(6).[1]

## FACTS

### A. Background

This opinion assumes that the reader is familiar with Judge Schwartzberg's prior de-

---

1. Navistar has abandoned its claims against Joanne under Sections 727 and 523(a)(4). It also appears that Navistar has abandoned any remaining claims, such as its Section 727 claim, against Michael.

cision. *Stelluti,* 163 B.R. 699. At all relevant times, Michael was president and sole shareholder of Crossroads Truck Center, Inc. ("Crossroads"), a New Jersey corporation. In November 1987, Crossroads and Navistar entered into a Dealership Agreement pursuant to which Crossroads sold Navistar vehicles. Paragraph 13 of the Dealership Agreement stated, in substance, that the proceeds of the sales of Navistar vehicles were property of Navistar to be held in trust by Crossroads.

Joanne was neither an officer nor a shareholder of Crossroads, but between 1986 and 1990, worked sporadically for Crossroads as a bookkeeper.[2] She also made deposits into the Crossroads operating account and answered the telephone. In March or April 1990, Crossroads' regular bookkeeper left, and Joanne's duties increased. Although she testified that she knew little about bookkeeping, she started to handle Crossroads' receivables and payables, wrote checks and recorded sales.

Both Michael and Joanne guaranteed Crossroads' debt to Navistar. Although she signed the guarantee, Joanne testified that she had very little understanding of what the underlying debt to Navistar might be.

## B. The Greenwich Transfers

In 1991, Crossroads sold Navistar vehicles to a third party at an aggregate price of $621,083.10. Crossroads deposited the proceeds into its operating account maintained at Somerset Trust Company in Somerville, New Jersey. The disposition of these proceeds—which Crossroads held in trust for Navistar—forms the basis of Navistar's claim in this adversary proceeding.

During the week of August 5, 1991, the Debtors learned that the Navistar dealership was in trouble. Jim Washer, a fellow Navistar dealer, told Michael that Navistar was "coming to get him," and was getting ready to "pull the plug" on Crossroads. It appears that Michael and Joanne had invested substantial personal assets in Crossroads.

Not surprisingly, the Washer news produced panic. According to Michael's deposition testimony in a New Jersey suit:

[I]t just hit me. I was sitting there and it came to me that, "Its over, they're coming after me and I didn't do anything." ... I just thought that they can come in and start taking money and closing accounts, you know. I didn't know what to do, and I just did it. I just said, "This is mine. I worked my ass off for this place...."

Plaintiff's Ex. B–1, at 173–74.

Michael convinced himself that the sales proceeds belonged to him, and that he had to take immediate action to protect his investment in Crossroads.

I felt that Navistar could attach my account and take all my money or something like that, and this was my loan money I took back and put it up there for keepings.

*Id.* at 206.

Michael shared these concerns with Joanne. Michael stated in his affidavit sworn to December 13, 1993, and when confronted with it, reiterated at trial that "[w]hen we [i.e., Michael and Joanne] learned from representatives of Navistar that Navistar was getting ready to 'pull the plug' on Crossroads and tighten up on credit, we took steps that we considered to be prudent in the interest of Crossroads." Affidavit of Michael Stelluti, ¶ 16, sworn to December 13, 1993.

Joanne confirmed that Michael had shared his concerns about Navistar's threatened actions and the effect on *their* investment. In her prior deposition testimony in the New Jersey action, she stated:

[Michael] said he had heard something through Jim Washer and he was very upset. Something with Navistar. And he just felt to secure our interest of money, that we had loaned the company he was taking our money out and going then to Chicago to—looking for help.

Plaintiff's Ex. A–10, at 7.

The Debtors protected their investment at Navistar's expense by diverting the sales proceeds. On August 8, 1991, Michael wrote a check to himself in the sum of $200,000.00

---

**2.** Joanne holds a license to sell real estate in New York and New Jersey.

from the New Jersey Crossroads operating account, and deposited that check into the Debtors' joint personal account at Chemical Bank in Bridgewater, New Jersey. Joanne knew that this deposit came from Crossroads' Operating Account.

On August 12, 1991, Michael and Joanne diverted the balance of the sales proceeds remaining in Crossroads' operating account and the portion recently deposited in their personal account. On August 12, Michael withdrew $280,000.00 from the New Jersey Crossroads' Operating Account and purchased a Somerset Trust bank check in that amount payable to Crossroads. On that same day, Joanne withdrew the $200,000.00 from the Debtors' Chemical Bank account, and procured a Chemical Bank check in that sum made payable to Michael.

Armed with these two checks aggregating $480,000.00, the Debtors drove approximately 60 miles from Bridgewater, New Jersey to Greenwich, Connecticut where Joanne opened two new accounts at Putnam Trust.[3] She deposited the $200,000.00 Chemical Bank check into a newly opened joint personal account, and deposited the $280,000.00 Somerset check into a newly opened Crossroads Money Market account. Michael conceded, at trial, that the Crossroads account was moved to Connecticut in order to place it beyond the reach of Navistar.

According to Joanne, she did not know that the money in the Crossroads account was Navistar's, and was not privy to Michael's plan to divert the assets away from Navistar. Nevertheless, the bank transactions and 60 mile trip raised her antennae; she thought them strange. But when she tried to question Michael, he became angry. As a result, she stopped asking questions and went along quietly.

After August 12th, the Debtors, individually or together, dissipated the balance of the moneys that they had deposited in the two Connecticut accounts, never distinguishing between "their" money and the Crossroads funds. On August 16, Michael paid $262,-341.26 from the Crossroads' account to the

FDIC, as receiver for Suburban National Bank, to satisfy a loan that the Debtors had personally guaranteed. From their personal account, Michael paid $50,000 toward the Debtors' first mortgage on their personal residence, and transferred approximately $40,000 to or for the benefit of Crossroads Leasing, an affiliated entity. Joanne paid approximately $58,000 to National Trailer Exchange to purchase trailers for Crossroads Leasing.

### C. The Cohn Transfer

Joanne made one other transfer on August 12th that Navistar challenges. On that date, Crossroads retained an attorney, Ned Cohn, to represent it in connection with its problems with Navistar. Joanne wrote a $30,-000.00 check from the Crossroads' Operating Account in New Jersey, and paid it to Cohn as a retainer on account of legal fees.

### D. The New Jersey Judgment

Prior to the petition, Navistar sued the Debtors in New Jersey federal district court (the "New Jersey Action"). After they commenced their bankruptcy case, the Bankruptcy Court granted Navistar's motion for relief from the automatic stay to proceed with the New Jersey Action.

On October 20, 1993, the district court granted partial summary judgment against Michael and Joanne. The district court found that Michael had converted and maliciously interfered with the Dealership Agreement, and these findings formed the basis of Judge Schwartzberg's grant of summary judgment under Section 523(a)(4) and (a)(6) against Michael. *Stelluti*, 163 B.R. at 702. The district court also granted partial summary judgment against both Debtors under their guarantees, and imposed an equitable lien in the sum of $55,235.15 against their home based upon their use of the sales proceeds to pay down their second mortgage.

### DISCUSSION

#### A. Introduction

██ Section 523(a)(6) of the Bankruptcy Code, 11 U.S.C. §§ 101–1330 (1994), prohib-

---

**3.** Crossroads had no nexus with Greenwich, Connecticut. The Debtors selected Greenwich be-

cause they have a grandchild living there.

its the discharge of a debt incurred "for willful and malicious injury by the debtor to another entity or the property of another entity." A "willful" injury is one that is deliberate or intentional. H.R.Rep. No. 595, 95th Cong., 1st Sess. 363 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 79 (1978); 3 Lawrence P. King et al., *Collier on Bankruptcy* ¶ 523.16[1], at 523–129 (15th ed. 1993) ("Collier").

On the other hand, a "malicious" injury is one that is wrongful and without just cause or excuse. *Id.* A "[s]pecific intent to harm or injure is not required," *Metromedia Co. v. Fugazy (In re Fugazy)*, 157 B.R. 761, 765 (Bankr.S.D.N.Y.1993), and malice is implied when "anyone of reasonable intelligence knows that the act in question is contrary to commonly accepted duties in the ordinary relationships among people, and injurious to another." *Citibank, N.A. v. Friedenberg (In re Friedenberg)*, 12 B.R. 901, 905 (Bankr. S.D.N.Y.1981); *accord Congress Financial Corporation v. Levitan, (In re Levitan)*, 46 B.R. 380, 388 (Bankr.E.D.N.Y.1985); *McGovern v. Capparelli (In re Capparelli)*, 33 B.R. 360, 365 (Bankr.S.D.N.Y.1983). The standard, therefore, is an objective one, and requires the Court to consider what the reasonable person knew or should have known at the time he or she committed the acts in question.

Ordinarily, claims under Section 523(a)(6) involve interference with a specific property right. This most commonly occurs where a debtor intentionally converts or diverts a creditor's property or collateral. *See, e.g., Ericson State Bank v. Conner (In re Conner)*, 59 B.R. 594, 596 (Bankr.W.D.Mo.1986) (conversion of creditor's sales proceeds); *First Nat'l Bank v. Overmyer (In re Overmyer)*, 52 B.R. 111, 121–22 (Bankr.S.D.N.Y. 1985) (diversion of bank's collateral); *Mileasing Co. v. Allavena (In re Allavena)*, 18 B.R.

527, 529 (Bankr.E.D.Pa.1982) (transfer of lessor's truck).

Section 523(a)(6) is not, however, limited to injuries to tangible property; it also excepts willful and malicious injury to an entity. Therefore, it also protects intangible rights and interests.[4] 3 Collier on Bankruptcy ¶ 523.16[1], at 523–130; *see Craycraft v. Adams (In re Adams)*, 21 B.R. 301, 9 B.C.D. 318, 319 (Bankr.N.D.Ohio 1982) (wife's right to consortium was a personal right under state law, and default judgment for loss of consortium was nondischargeable under Section 523(a)(6)).

A creditor, even one that is unsecured, has an intangible, legally protected interest in its debtor's property. The creditor has the right to look to the debtor's property to satisfy its claim, and the law provides remedies if the debtor or a third party interferes with that interest. For example, under the law of New Jersey—the situs of the Debtors' activities—as well as most if not all jurisdictions, an unsecured creditor can sue to avoid a fraudulent transfer, New Jersey Statutes Annotated ("N.J.S.A.") 25:2–29 (West 1993), including a transfer to an insider[5] on account of an antecedent debt if (1) the debtor was insolvent at the time and (2) the insider had reasonable cause to believe that the debtor was insolvent. Such laws recognize the creditor's legally enforceable right to prevent its debtor from intentionally stripping itself of the ability to pay the debt, and to punish those who assist the diversion. *See B.K. Medical Systems Inc. Pension Plan v. Roberts (In re Roberts)*, 81 B.R. 354, 378 (Bankr. W.D.Pa.1987).

Joanne's participation in the diversion of the sales proceeds interfered with Navistar's right to enforce its claim against Cross-

---

4. This distinction is an important one to make in this case. Judge Schwartzberg previously found that the sales proceeds belonged to Navistar. Hence, Joanne's conduct arguably constituted a conversion despite her honest belief that the sales proceeds belonged to Crossroads; ignorance or mistake regarding Navistar's property rights provides no defense. *See* Restatement (Second) of Torts, §§ 222A, 244 (1965). It does not follow, however, that her conversion gave

rise to a non-dischargeable debt. A technical conversion is often not "malicious", and hence, does not satisfy Section 523(a)(6). 3 Collier ¶ 523.16[1] at 523–130–31.

5. Under New Jersey law, both Debtors were insiders of Crossroads. *See* N.J.S.A. § 25:2–22(b) (corporate insiders include officers, directors and persons in control, as well as their relatives).

roads; and gave rise to a non-dischargeable debt. First, Joanne's conduct satisfies the "willful" element of Section 523(a)(6). She acted deliberately and intentionally when she diverted the sales proceeds from New Jersey to Connecticut. On August 12, 1991, she withdrew the $200,000 from the Debtor's account in New Jersey by procuring a check made payable to Michael. She then drove with Michael to Greenwich, Connecticut where she opened the two new Greenwich accounts into which she deposited the aggregate sum of $480,000.00. These actions were neither accidental nor unintentional.

Second, although Joanne did not know that Crossroads held the sales proceeds in trust for Navistar, and believed that they represented Crossroads' funds, she nevertheless acted maliciously. Prior to August 12, 1991, she knew that Navistar was threatening to "pull the plug" on Crossroads, and that Michael and she needed to secure their interests (i.e., protect their investment in Crossroads). She knew or should have known that Navistar might seek to recover the sums in the Crossroads operating account, and if it did, that the Debtors' investment in Crossroads would be jeopardized.[6] Finally, Joanne knew or should have known that diverting the money—a substantial portion of which was already held in the Debtors' personal account—from New Jersey to Connecticut, lacked any personal or business justification and impaired Navistar's ability to recover the money. Therefore, she knew or should have known that her actions would harm Navistar's ability to satisfy its claims against the diverted sales proceeds.

■ In response, Joanne argues that her actions were not malicious because she was an innocent spouse who was not privy to Michael's fraudulent scheme. She conceded, however, that she thought these bank transactions and the 60 mile car trip were strange, and that she questioned Michael about them. She only terminated her inquiries because Michael became angry and not because he satisfied her that their activities were justified. It is true that Joanne's principal motivation was to assist Michael, and that she did not know that Crossroads held the sales proceeds in trust for Navistar. Lack of knowledge of a creditor's rights, however, is not sufficient to negate malice unless it is coupled with a good faith belief that those actions will not injure the creditor. See Security State Bank v. Nelson (In re Nelson), 67 B.R. 491, 498 (Bankr.D.Minn.1985).

In this case, Joanne's actions were not objectively innocent, and she could not have harbored a good faith belief that her actions were proper or justified or would not prejudice Crossroads' rights as a creditor of Navistar. As the Court has already stated, Joanne knew that Navistar was about to "pull the plug", and the diversion of the $480,000.00 from New Jersey to Connecticut served no legitimate business or personal objective or served any purpose other than to place the funds beyond Navistar's reach. Her participation in the scheme to divert these funds was "contrary to commonly accepted duties in the ordinary relationships among people, and injurious to another." Friedenberg, 12 B.R. at 905. The injury she caused to Navistar's creditor's rights was "malicious" as a matter of law, and the fact that her subjective intent was to help Michael rather than harm Navistar makes no difference.

■ The Court reaches a different conclusion regarding the payment of $30,000 to Ned Cohn. Although this payment was willful, Navistar failed to prove that it was also malicious. Joanne issued the check from the Crossroads' Operating Account to pay for legal services required by Crossroads. She believed the money belonged to Crossroads, and was paying a corporate obligation. There is no evidence that she lacked an honest belief in the propriety of her action or that she knew or should have known that this payment would harm Navistar. The activi-

---

6. The Debtors' testimony that they were trying to protect their investment—which presumably provided justification for their action—is disingenuous. After Michael transferred the $200,000 from Crossroads to the Debtors' account, Michael and Joanne proceeded to divert Crossroads remaining funds as well as the $200,000.00, using the Crossroads funds to satisfy a debt that they had guaranteed. It seems that the Debtors were enhancing rather than merely securing their interests at Navistar's expense.

ties of August 12, 1991 that justified the finding of malice are absent here.

The foregoing constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a) made applicable by Fed.R.Bankr.P. 7052.

### CONCLUSION

That portion of Navistar's claim against Joanne, in the sum of $480,000.00, is non-dischargeable. The remaining claims against Joanne are dismissed on consent. The parties are directed to settle a final judgment, on notice, which will completely resolve all of the claims asserted in this adversary proceeding.