In re Thomas A. MARTIN, Debtor.

Thomas A. MARTIN, Appellant/Cross–Appellee,

v.

KEY BANK OF NEW YORK, N.A., Appellee/Cross–Appellant.

Nos. 95–CV–264(L)(FJS), 95–CV–107.

United States District Court,
N.D. New York.

May 22, 1997.

DeGraff, Foy, Holt–Harris, Mealey & Kunz, Albany, NY (John D. Rodgers, Vanessa R. Elliott, of counsel), for Appellant/Cross–Appellee.

Hiscock & Barclay, L.L.P., Albany, NY (Robert G. Qulia, of counsel), for Appellee/Cross–Appellant.

## MEMORANDUM DECISION AND ORDER

FREDERICK J. SCULLIN, Jr., District Judge.

Presently before the Court are: (1) appellant/cross-appellee Thomas A. Martin's appeal pursuant to 28 U.S.C. § 158 from an order of the United States Bankruptcy Court for the Northern District of New York (Stosberg, J.)[1] finding that Martin had committed willful conversion, in violation of 11 U.S.C. § 523(a)(6), and denying discharge to Martin for violations of 11 U.S.C. § 727(a)(2), (a)(3), (a)(4) and (a)(5); and (2) appellee/cross-appellant Key Bank of New York, N.A.'s cross-appeal of the Bankruptcy Court's failure to award it attorney's fees.[2]

## BACKGROUND

Martin, through partnerships and companies he controlled, including Kinderhill Corporation, Kinderhill Investment Corp. ("KIC") and Kinderhill Select Bloodstock, Inc. (collectively, the "Kinderhill companies"), operated a horse farm that specialized in breeding thoroughbred horses. The Kinderhill companies were quite successful through the early 1980s. Throughout those

---

1. Judge David T. Stosberg of the United States Bankruptcy Court in Louisville, Kentucky, presided by designation.

2. The cross-appeal and appeal were originally filed in error as separate appeals. By order dated February 28, 1995, Martin's appeal, No. 95–CV–264, and Key Bank's appeal, No. 95–CV–107, were consolidated, with Martin's appeal as the lead case, and Key Bank's appeal as the cross-appeal.

years, Key Bank entered into numerous financing transactions and modifications thereof with Martin and the Kinderhill companies. Key Bank's collateral portfolios under these various loans were extensive and varied.

The Kinderhill companies' prospects dwindled toward the end of the 1980s, dramatically worsening by 1989 and 1990. As part of a complex series of loan restructurings and related transactions, Key Bank loaned KIC $2.5 million on March 11, 1988. Pursuant to this loan agreement, Key Bank was given as collateral mortgage or security interests in various real properties, thoroughbred horses, works of art, furniture and antiques owned by Martin and KIC. Attached to the security agreement memorializing this collateral was an insurance appraisal ("Schedule A") listing and valuing various pieces of collateral.

In early 1991, after the Kinderhill companies suffered further financial distress and defaulted on the March 11, 1988 loan, Key Bank commenced a replevin action against Martin and KIC seeking possession of various chattels in which Key Bank claimed a security interest, including items on Schedule A. In settlement of that suit, a stipulation was entered on March 14, 1991, which allegedly provided for the immediate surrender of the items of collateral in KIC's possession to Key Bank.

Soon after Martin entered into the stipulation, he contacted an antiques dealer, Harold Sack, resulting in the sale of a Queen Anne table listed on Schedule A. According to Key Bank, and uncontested by Martin, the $60,000 Martin received for the table was deposited into a bank account of the Old Chatham Tennis Club, Inc. (the "Tennis Club"), Old Chatham, New York, of which Martin was the president, and to which account Martin had access. Martin failed to include this sale in his bankruptcy schedules.

Martin and the Kinderhill companies filed a voluntary petition under Chapter 11 on April 6, 1992, after KIC defaulted on the $2.5 million loan from Key Bank. Martin then sold another antique, a Queen Anne lowboy, to Sack in July of 1992, receiving $65,000 in

return. Again, the $65,000 Martin received was deposited into the Tennis Club's bank account.

Martin contacted Sack again in October of 1992, stating his readiness to dispose of additional antiques that were subject to Key Bank's lien, but Sack made no further purchases. However, one of the items offered by Martin was missing from the adjusters' inventory and was never located.

In October of 1992, the proceedings were converted to Chapter 7 and trustees were appointed. After Martin filed, Key Bank moved successfully to have the automatic stay lifted in order to evict Martin from his Old Chatham, New York, residence and offices, which were titled to Key Bank.

In March of 1993, two appraisers, Elias Cadan and John Blaine Warner, were engaged to prepare an inventory of the fine arts, antiques and other property located in Martin's residence and offices in Old Chatham. Several weeks later, Schaap Moving & Storage Company ("Schaap"), as agents for Key Bank, removed substantially all of the physical property located at Martin's Old Chatham residence and offices.[3] This property was stored at an Albany warehouse operated by Schaap.

The initial inventory revealed that certain items on Schedule A were missing from the offices and residences. The value of these missing items was calculated at $185,351, based upon the appraised values included in Schedule A.

Key Bank brought an adversary proceeding against Martin, which was tried in late October of 1994. In a decision issued December 20, 1994, the Bankruptcy Court found that the missing items of collateral fell into three broad categories: (1) valuable items admittedly sold by Martin; (2) valuable items still in Martin's possession; and (3) items that Martin claims were lost or sold by the bank after repossession. The court concluded that Martin had violated 11 U.S.C. § 523(a)(6) by willfully and maliciously con-

---

**3.** According to Key Bank, on the same day it exercised its right to evict Martin, Martin had contracted with Mabey's Moving Company, which filled several moving vans with furniture and records.

verting collateral that was subject to a security agreement, either by selling or concealing it, and entered judgment for Key Bank in the amount of $189,956.[4]

The Bankruptcy Court also declined to discharge Key Bank's claim against Martin, because the court found violations of 11 U.S.C. § 727(a)(2), (a)(3), (a)(4) and (a)(5), sections of the Bankruptcy Code that deny discharge where a debtor has concealed property or financial records with intent to defraud a creditor or failed to explain satisfactorily any lost assets. This appeal and cross-appeal followed.

## DISCUSSION

The District Court reviews a Bankruptcy Court's "conclusions of law *de novo,* and findings of fact under a clearly erroneous standard." *In re Ionosphere Clubs, Inc.,* 922 F.2d 984, 988 (2d Cir.1990). "[I]t is axiomatic that this court will reverse the Bankruptcy Court only if it is left with the definite and firm conviction that a mistake has been committed." *In re Abrantes Constr. Corp.,* 132 B.R. 234, 236 (N.D.N.Y.1991) (internal quotation omitted).

### I. Martin's Appeal

#### A. Section 523(a)(6)

Martin argues that the Bankruptcy Court erred in finding that Martin willfully and maliciously converted the missing items in violation of 11 U.S.C. § 523(a)(6). Specifically, Martin argues that no evidence of the required intent was adduced at trial, and that several of the missing items were either located elsewhere or lost by the moving company, such that he should not be held responsible for their conversion. This Court finds that the Bankruptcy Court applied the correct legal standard and made no clearly erroneous findings of fact. Therefore, its determination must be upheld.

■ Section 523(a)(6) provides that a debtor is not discharged under § 727 from any debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." Willful and malicious

conversion clearly falls within this subsection. 4 Collier on Bankruptcy ¶ 523.12 (15th rev. ed.1996). In this context, willful "means 'deliberate or intentional,'" and malicious "means wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will." *In re Stelluti,* 94 F.3d 84, 87 (2d Cir.1996). "Implied malice may be demonstrated 'by the acts and conduct of the debtor in the context of [the] surrounding circumstances.'" *Id.* at 88 (quoting *In re Stanley,* 66 F.3d 664, 668 (4th Cir.1995)) (alteration in *Stanley).* "[M]alice is implied when anyone of reasonable intelligence knows that the act in question is contrary to commonly accepted duties in the ordinary relationships among people, and injurious to another." *In re Stelluti,* 167 B.R. 29, 33 (Bankr.S.D.N.Y.1994) (quotation omitted), *aff'd,* 94 F.3d 84 (2d Cir.1996). Therefore, proof of specific intent is not necessary. *See id.* Willful and malicious injury must be proved by a preponderance of the evidence. *See Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).

■ Martin argues that the Bankruptcy Court adduced no facts to support its finding of willful conversion. This Court disagrees. The Bankruptcy Court found that "Martin wilfully and maliciously converted [the missing] items either by selling the items or concealing them and retaining them in his possession and control." In reaching this conclusion, the court appropriately focused much of its attention on Martin's sale in 1991 of the two antiques that were covered by Key Bank's security interest. Martin admits that he sold these items despite Key Bank's security interest, but argues that he did not intend to convert them because he believed that Key Bank had released its lien on these items in the stipulation of March 14, 1991. The Bankruptcy Court clearly rejected Martin's proffered excuse, characterizing Martin's explanation as "nothing more than a belief of convenience," and making clear that it inferred from Martin's lack of credibility not only that what he said was untrue, but that the opposite of what he said was true.

**4.** Apparently two of the missing items were later located in the possession of one of Martin's ex- wives, Virginia Martin. The value of these two items was not included in the court's calculation.

There is no clear error in the Bankruptcy Court's finding of intent, particularly in light of the deference afforded trial courts in determinations of credibility. *See Anderson v. City of Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).

Martin also argues that the Bankruptcy Court erred because several of the missing items were lost by the moving company or located elsewhere. Martin's contention that the moving company lost or stole some of the items is wholly unsupported. Rather, it is contradicted by the fact that on the day Martin was evicted, he moved articles out of his Old Chatham residence and offices himself. Nor is Martin's case served by the fact that items may be located elsewhere. That Martin knows the whereabouts of Key Bank's collateral but has failed to be forthright with that information will not serve to disprove the case against him for willful conversion. If Martin claims to be unaware of what happened to the items, the Bankruptcy Court is not in error in refusing to find this claim credible.

### B. Judicial Bias

▇▇▇ Martin also contends that the Bankruptcy Court's determination was so infected with bias as to constitute reversible error. In support of this contention, Martin relies essentially on the strong language in the Bankruptcy Court's final order with which the court decried Martin's lack of credibility. Martin draws this Court's attention to several examples of the Bankruptcy Court's language:

"Martin testified with impudence throughout the trial." (Tr. of Dec. 20, 1994, at 11).

"Suffice it to say, the longer Mr. Martin testified, the lower his credibility dropped until it reached a zero level during the trial." (*Id.* at 12).

"Martin embellished his absurd explanation ... " (*Id.* at 15).

"Mr. Martin, far from being the honest but unfortunate debtor, rather is the epitome of a dishonest and undeserving debtor." (*Id.* at 24).

"[Martin] exhibited unmitigated gall in offering preposterous explanations to justify his fraudulent conduct." (*ld.*).

Certainly, these and similar comments leave no doubt as to the Bankruptcy Court's low opinion of Martin's conduct and, more particularly, his credibility. While Martin may find such comments abusive and unfair, determinations of credibility are not only one of the trial court's responsibilities, but perhaps that court's most important responsibility, "because the trial judge is in the best position to evaluate a witness's demeanor and tone of voice as well as other mannerisms that bear heavily on one's belief in what the witness says." *Donato v. Plainview–Old Bethpage Cent. Sch. Dist.,* 96 F.3d 623, 634 (2d Cir.1996) (citing *Anderson,* 470 U.S. at 575, 105 S.Ct. at 1512), *cert. denied,* —— U.S. ——, 117 S.Ct. 1083, 137 L.Ed.2d 218 (1997).

Martin fails to allege bias in the legal sense, but rather only recounts the many instances in which the court, in its final decision, found him deplorably dishonest. This will not suffice to state a meaningful claim of judicial bias. *See, e.g., In re Croton River Club, Inc.,* 162 B.R. 648, 654 (S.D.N.Y.1993) (judge's open skepticism during an evidentiary hearing over a witness's testimony was not improper bias but rather a judgment that the testimony was not credible), *aff'd in part and modified in part,* 52 F.3d 41 (2d Cir.1995). Certainly, a trial judge sitting with a jury "must at all times maintain the appearance of impartiality and detachment." *United States v. Mazzilli,* 848 F.2d 384, 388 (2d Cir.1988). However, where a bench trial is held, at some point the trial court must enter a decision, and that decision can appropriately be based on determinations of credibility. Although Judge Stosberg's language was indeed vehement, it does not threaten the appearance of impartiality. Given that Martin's credibility is highly relevant to the disposition, the Court finds that such conduct certainly does not rise to the level of judicial bias.

### C. Section 727(a)

Finally, Martin argues that the Bankruptcy Court erred in denying discharge under four subsections of § 727(a), because the Bankruptcy Court failed to make any specific findings of fact. In particular, with respect

to subsection (a)(2), Martin argues that the court failed to make any findings as to intent to defraud.

■ Denial of discharge is warranted where any one of § 727's subsections is proved by a preponderance of the evidence. *See In re Serafini,* 938 F.2d 1156, 1157 (10th Cir.1991); *In re Wolfson,* 139 B.R. 279, 285 (Bankr.S.D.N.Y.1992), *aff'd,* 152 B.R. 830 (S.D.N.Y.1993). The Bankruptcy Court found that four different subsections of § 727 were triggered in the case at hand:

> In summary, Mr. Martin fails in the "take your pick["] category: that is, take your pick under which section he should be denied a discharge as he should be denied a discharge under all of the allegations, that is Section 11 U.S.C. 727(a)(2), (3), (4) and (5).

(Tr. of Dec. 20, 1994, at 27). As regards § 727(a)(2), transfer, removal, destruction, mutilation or concealment of property "with intent to hinder, delay or defraud a creditor," the court found that Martin "failed to satisfactorily explain the loss of assets, for example, the monies that he received and commingled." *(Id.).* As regards § 727(a)(3), failure to keep or preserve records, the court found that Martin "failed to produce books and records, to wit: he simply submitted none at trial." *(Id.).* As regards § 727(a)(4)(A), knowingly and fraudulently making false oaths in connection with the bankruptcy estate, the court found that Martin "made a false oath by, at a minimum, not listing the Europco shares and not listing the various items of property he held." *(Id.).* As regards § 727(a)(5), failure to satisfactorily explain the loss or deficiency of assets to meet one's liabilities, the court found that Martin "concealed and sold assets, both prepetition and postpetition, and admitted having assets that were not listed in the Schedules." *(Id.).*

■ Section 727 is a disjunctive list of circumstances that warrant denial of discharge. As such, if any one of the four subsections relied upon by the Bankruptcy Court is satisfied, this Court must affirm the Bankruptcy Court's ruling. It seems quite clear that Martin satisfies the requisites of § 727(a)(3), failure to keep or preserve books and records from which his financial condition might be ascertained. "The fundamental policy underlying § 727(a)(3) is to insure that the trustee and the creditors receive sufficient information to effectively enable them 'to trace the debtor's financial history, to ascertain the debtor's financial condition, and ·to reconstruct the debtor's business transactions.'" *In re Frommann,* 153 B.R. 113, 116 (Bankr.E.D.N.Y.1993) (quoting *In re Goldstein,* 123 B.R. 514, 522 (Bankr.E.D.Pa. 1991)). " 'Complete disclosure is in every case a condition precedent to the granting of the discharge ... ' " *Id.* at 117 (quoting *In re Underhill,* 82 F.2d 258, 259–60 (2d Cir.1936)). There is no intent requirement to this subsection. *See id.* at 116.

■ In the present case, it is quite clear, by Martin's own testimony, that Martin gifted various pieces of collateral listed on Schedule A to his children. Martin has never introduced any written trusts for his children, nor written records of these gifts. In addition, it is uncontested that Martin failed to disclose to the court that he had sold certain antiques listed on Schedule A and deposited the receipts from those sales in the bank account of the Tennis Club. In each case, records of these transactions involving Key Bank's collateral were not recorded and provided to the Bankruptcy Court, but rather the transactions had to be unearthed by the creditors and court. "A court should not be required to speculate as to any loss of assets that have been in the debtor's possession, nor should the trustee or creditors be required to reconstruct the debtor's affairs." *Id.* at 117. This is exactly what Martin's conduct has made necessary in this case. The facts presented clearly satisfy the requisites of § 727(a)(3).

■ In the alternative, Martin's conduct also clearly satisfies the requisites of § 727(a)(4)(A), knowingly and fraudulently making false oaths or accounts in connection with debtor's bankruptcy case. To deny a debtor discharge under this section, the objector must prove: "(1) the debtor made a statement under oath; (2) such statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case." *Id.* at 118 (citing *Matter of Beaubouef,* 966 F.2d 174, 178 (5th Cir.1992)). Encompassed within § 727(a)(4)(A) are " ' (1) a false state-

ment or omission in the debtor's schedules or (2) a false statement by the debtor at the examination during the course of the proceedings.'" *Beaubouef,* 966 F.2d at 178 (quoting 4 Collier on Bankruptcy ¶ 727.04[1], at 727–59 (15th ed.1992)).

 The existence of fraudulent intent is a question of fact, and the creditor bears a considerable burden in demonstrating such intent. *See In re Miller,* 39 F.3d 301, 306–07 (11th Cir.1994). "While direct proof of fraudulent intent is often difficult to establish, courts frequently infer it from the debtor's course of conduct." *United States v. Coppola,* 85 F.3d 1015, 1021 (2d Cir.1996). In particular, courts are generally drawn to "badges of fraud", *i.e.,* instances of conduct that typically suggest fraud. *See In re Kaiser,* 722 F.2d 1574, 1582 (2d Cir.1983). "she confluence of several ['badges of fraud'] can constitute conclusive evidence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." *In re Sherman,* 67 F.3d 1348, 1354 (8th Cir.1995) (quotation omitted).

 The evidence in this case reveals several "badges of fraud." For example, Martin admitted at trial that he failed to disclose checks he made payable to himself out of the bank account of the Tennis Club. Martin admitted gifting property to his children. Martin also failed to disclose his ownership of 86 shares of Europco Management Company of America in his bankruptcy schedules. These are all classic "badges of fraud." *See Kaiser,* 722 F.2d at 1582–83 (secreting proceeds, transferring property to family members, and concealing facts are all "badges of fraud" under § 727(a)(2)(A) and (a)(4)(A)). From these few examples alone, Martin's fraudulent intent is apparent to this Court. The cavalier manner in which this sophisticated businessman went about shifting assets and commingling funds, all without making any report of same to the Bankruptcy Court, cannot allow any inference other than an intent to defraud. Further, this Court must concur with the Bankruptcy Court's opinion of Martin's excuses for his conduct as "preposterous explanations to justify his fraudulent conduct." Therefore, this Court also affirms the denial of Martin's discharge for violations of § 727(a)(2) and (a)(5).

## II. Key Bank's Cross–Appeal

In its cross-appeal, Key Bank contends that the Bankruptcy Court erred in failing to award Key Bank attorneys' fees. In particular, Key Bank argues that the court "evidently overlooked that portion of the relief sought by Key Bank" in its complaint dated March 16, 1993.

Key Bank asserts that the various loan documents in question, particularly the loan agreement of March 11, 1988, and the loan restructure agreement of June 30, 1989, clearly establish Key Bank's right to recover reasonable attorneys' fees in collecting any and all sums due under those agreements, and that the amount of those fees would be added to the total amount of the debt due. Key Bank contends that these attorneys' fees were to be incorporated into the total debt owed by Martin.

 The clear language of the agreements provides Martin's liability for reasonable attorneys' fees incurred in the collection of the debt. Under New York law, which controls the loan agreements, contractual provisions in which one party accepts liability for expenses, including attorneys' fees, incurred in connection with enforcement of rights under the agreement, are enforceable. *See Industrial Equip. Credit Corp. v. Green,* 92 A.D.2d 838, 460 N.Y.S.2d 337, 338 (1st Dep't 1983), *aff'd,* 62 N.Y.2d 903, 478 N.Y.S.2d 861, 467 N.E.2d 525 (1984).

 In this case, Martin was found liable to Key Bank under § 523(a)(6). The meaning of "debt" within § 523(a) has been construed broadly. *See TranSouth Fin. Corp. v. Johnson,* 931 F.2d 1505, 1507 (11th Cir.1991) ("debt" under § 523(a) "would appear to include a debtor's contractual obligation to pay a creditor's attorney's fees"); *In re Kellar,* 125 B.R. 716, 720 (Bankr.N.D.N.Y.1989) (permitting award of attorneys' fees in dischargeability actions under § 523(a) where there is an enforceable contract); *accord Mayer v. Spanel Int'l Ltd.,* 51 F.3d 670, 677 (7th Cir.) ("Attorneys' fees provided by contract are part of the debt, and if the principal and (pre-bankruptcy) interest on the debt are non-dischargeable, so are the other elements of the debt."), *cert. denied,* —— U.S. ——, 116 S.Ct. 563, 133 L.Ed.2d 488 (1995); *Matter of*

*Luce,* 960 F.2d 1277, 1286 (5th Cir.1992); *In re Hunter,* 771 F.2d 1126, 1131 (8th Cir. 1985); *In re Martin,* 761 F.2d 1163, 1168 (6th Cir.1985). This Court agrees and finds that the contractual obligation to pay attorneys' fees is included within the meaning of "debt."

The Bankruptcy Court's failure to address this issue in its order of December 20, 1994, supports Key Bank's contention that the issue was overlooked. Further, Martin does not appear to dispute the validity of the attorneys' fees provisions of the loan agreements. Therefore, based upon the clear language of the agreements, this Court remands this matter to the Bankruptcy Court to determine an appropriate award of attorneys' fees to Key Bank for its collection pursuits in this action.

### CONCLUSION

For the foregoing reasons, the judgment of the Bankruptcy Court is AFFIRMED as to Martin's violations of §§ 523 and 726, and REMANDED to the Bankruptcy Court's for the calculation of Key Bank attorneys' fees.

**IT IS SO ORDERED.**