**In re Gail MITCHELL, Debtor.**

**ALDUS GREEN COMPANY and Kraus Management, Inc., Plaintiffs,**

v.

**Gail MITCHELL, Defendant.**

**Bankruptcy No. 98 B 42014(SMB).**
**Adversary No. 98/8915A.**

United States Bankruptcy Court,
S.D. New York.

Nov. 16, 1998.

Kraus & Kraus, Long Island City, New York, Rita M. Rizzo, of counsel, for plaintiffs.

Gail Mitchell, Bronx, New York, pro se.

## MEMORANDUM DECISION DETERMINING NON–DISCHARGEABILITY OF RENT OBLIGATION

STUART M. BERNSTEIN, Bankruptcy Judge.

The Plaintiffs, Aldus Green Company ("Aldus") and its managing agent, Kraus Management, Inc. ("Kraus"), seek a determination that the debtor's unpaid rent obligation, accruing between June 1, 1997 and November 30, 1997, is not dischargeable.[1] They rely on sections 523(a)(2)(A) and 523(a)(6) of the Bankruptcy Code. The Court conducted a trial on October 20, 1998, heard the testimony of four witnesses, including the debtor,

---

1. The *ad damnum* clause in the complaint requests a total denial of the debtor's discharge pursuant to 11 U.S.C. § 727. This appears to be sloppy drafting. The body of the complaint alleges facts relating solely to the dischargeability of Aldus' debt, and cites various provisions of 11 U.S.C. § 523(a). In any event, the plaintiffs failed to offer any evidence in support of an objection to discharge.

and received documentary evidence. The Court concludes that Kraus, as agent for Aldus—a disclosed principal—holds no claim against the debtor, and accordingly, its claim in this adversary proceeding is dismissed. In addition, the Court concludes that Aldus has failed to satisfy its burden of proof under 11 U.S.C. § 523(a), and accordingly, its rent claim is dischargeable.

## BACKGROUND

### A. Introduction

Aldus owns HUD-subsidized housing located at 990 Aldus Street in the Bronx. To get the HUD subsidy, the tenant undergoes an annual certification process which determines the portion of the rent HUD will subsidize. In simplest terms, the annual recertification involves a three part process: the tenant must (1) complete a questionnaire, (2) supply certain employment, financial and personal documentation and (3) sign the certification. If the tenant does not comply, she may lose her subsidy.

The existence and amount of the subsidy do not affect the aggregate rent obligation. The landlord is entitled to receive the HUD-approved market rent for each apartment. The landlord collects the subsidized portion from HUD and the unsubsidized portion from the tenant. Thus, as the subsidy decreases, the amount that the tenant must pay goes up. It is, therefore, in the tenant's economic interest to satisfy the requirements for certification. It makes no difference to the landlord, except to the extent that HUD is a better payment risk than the tenant.

Here, the debtor and Aldus entered into a one year lease, dated September 3, 1991, (Plaintiff's Exhibit ("PX") 5), for apartment 6B, and the debtor began her occupancy at that time. The lease renewed automatically each year. The debtor could terminate the lease for any reason on thirty days notice. (*Id.*, § 38(a).) Aldus could only terminate the lease for material breach, material failure to comply with obligations imposed under state landlord-tenant law or "other good

cause." (*Id.*, § 38(b), (c).) The lease obligated the debtor, among other things, to pay rent in a timely fashion, (*id.*, §§ 3, 20), and comply with Aldus's requests for information and certifications regarding the HUD rent subsidy program. (*Id.*, § 6(c)). If the debtor breached the latter duty, Aldus's remedies were limited; it could require her to pay the HUD-approved market rent and effectuate rent increases without first providing the thirty day notice otherwise required. (*Id.*, § 32.)

### B. The Eviction Proceedings

Prior to June 1997, the debtor met her obligations *vis-a-vis* Aldus' certification efforts, and generally (though not always) paid her rent without incident. She stopped paying her rent completely beginning with June 1997. At that time, the HUD-approved market rent was $1,350.00 per month. The debtor paid $412.00 and HUD paid the balance. On or about July 3, 1997, Aldus commenced a nonpayment proceeding, (PX 6), which culminated in a judgment of possession against the debtor, by default, on August 1, 1997. (PX 7.) [2] By order to show cause, issued at 2:46 p.m. that same day, the debtor moved to vacate the judgment, and obtained a stay against the issuance of the warrant of eviction. (PX 8, p. 1.) The accompanying affidavit, (*id.*, p. 2), signed by the debtor, stated:

I would like to make arrangements with landlord to pay the sum of $824 by the 21st of August.

I missed my court date because I was at the hospital with my sister since 4 a.m. this morning.

The debtor failed to appear on August 8, 1997, the return date. As a result, the stay issued on August 1st was vacated, and her motion was denied. (PX 9.)

The debtor filed a second order to show cause on August 12, 1997. (PX 10.) Her brother, Dexter Lucas, signed the accompanying affidavit in the debtor's name but with her knowledge and consent. The affidavit stated, in substance, that the debtor could not attend court on August 8th because she

---

**2.** The court also awarded a money judgment in the sum of $612.00, plus costs and disbursements. Aldus had sought a judgment in the sum of $824.00—two months rent—in its petition. It did not explain at trial why the housing court awarded the lower amount.

was renewing her lease at the landlord's headquarters in Long Island City and did not finish until 12:00 noon.[3] The affidavit also stated that the debtor would like to pay her rent by the end of the month, and have the opportunity to apply for "Jiggetts," another benefits program. The court signed the second order to show cause, again staying any further eviction efforts, and made the motion returnable on August 19, 1997.

Mr. Lucas appeared on the return date, again with the debtor's knowledge and consent. At that time, the parties entered into a stipulation, (PX 11), which provided, in material part, that (1) the debtor's motion was granted and the prior judgment was vacated, (2) the debtor consented to a final judgment in the sum of $1,236.00 (the unpaid rent for June, July and August),[4] and (3) the issuance of the warrant of eviction was stayed through September 19, 1997. The stipulation did not include a payment schedule. Instead, it required the debtor to pay the past due rent by September 19th to avoid eviction. However, the warrant could issue before then. The stipulation required the debtor to remain current in the payment of future rent, (id., ¶ 6), and authorized Aldus to execute the warrant without further notice in the event of a default. (Id., ¶ 4.)

The debtor did not make any payments after the stipulation, and twice sought a further stay from the housing court without success. On September 9, 1997, the debtor submitted a third order to show cause. (PX 14.) The accompanying affidavit, signed by the debtor's sister, stated that the debtor did not have the money to pay the rent, and would like to have more time to move from the apartment. (Id., p. 2.) The court refused to sign the order to show cause because it offered "no valid reason to vacate the prior agreement." (Id., p. 1.) The debtor submitted a similar application on September 19, 1997, "supported" by another affidavit from her sister substantially identical to her

September 9 affidavit. (PX 15.) The court again refused to sign the order to show cause because it did not show a meritorious defense and was presented by the debtor's sister. (Id., p. 1.)

It is unclear whether the debtor was ever actually evicted, although a warrant of eviction issued on October 29, 1997. (See PX 13.) She moved out on or about November 1, 1997, to live with her mother.

### C. The Recertification Efforts

In May, 1997, Aldus began the recertification process. On May 19, Kraus sent the debtor a list of documentation that she should bring with her to a meeting with Gladys Prospere at the management office located at 996 Aldus Street. (PX 18.) Ms. Prospere was available to interview the debtor on June 2, 1997; if the debtor could not make it on that day, she should contact Ms. Prospere to schedule an appointment.

The debtor did not supply the information or schedule an appointment, and Kraus wrote several follow up letters. (See PX 18.) The first, dated June 17, 1997, advised the debtor that "HUD regulations requires [sic] that your recertification be entirely completed by *August 10, 1997* or *we may terminate your subsidy.*" (Emphasis in original.) It directed the debtor to submit the recertification information by July 2, 1997. The next follow up letters, dated June 26 and July 30, 1997, informed the debtor that her monthly rent would increase to $1,350.00 on September 1 if she did not complete the recertification process by August 10, 1997.

Eventually, the debtor submitted most of the information that Kraus had requested. On the morning of August 8, 1997, the debtor wrote to Julissa Peralta, a Kraus employee, that she could not keep their 2:00 p.m. appointment—which had apparently been prearranged—because she had to go to court.[5]

---

3. In fact, the debtor had canceled her August 8th appointment with the landlord, explaining that she had to go to court.

4. The judgment, if entered, was apparently lost. At trial, Aldus introduced a judgment dated October 22, 1997, and entered on October 29, 1997. (PX 13.) The judgment states that the issuance

of the warrant of eviction is stayed to and including September 19, 1997.

5. On that same day, the debtor's brother had represented to the housing court that the debtor could not appear because she had to go to the landlord's office in Long Island City. At trial, the debtor explained that when she faxed the

(PX 19, p. 1.) She faxed the recertification documentation with the letter, including a letter from her current employer, recent pay stubs, a 1996 Form W–2, and school reports relating to her two children. (*Id.*, pp. 2–9.) She inquired if Ms. Peralta could "fix all the paper work up, and I come to your office today at 4:00pm or Monday morning to sign my new lease." (*Id.*, p. 1.) The letter to Peralta concluded:

> It is very important to me that I get my new lease signed. I do not want my rent to go up to the market rent. I hope all this paperwork is sufficient.
>
> I should be home by 2:00pm. Please call me (718–861–2379).

(*Id.*)

Peralta never called the debtor. No one else from Kraus or Aldus did either. Instead, on August 27, 1997, Kraus sent the debtor a "Final Notice." (PX 18.) It referred to Kraus's July 30th letter, did not mention the debtor's August 8th letter or transmission, stated that the debtor had not complied with Kraus's requests relating to the annual certification, and declared that effective September 1, 1997, the debtor's monthly rent would rise to $1,350.00.

## DISCUSSION

### A. Introduction

■ Aldus's complaint asserts two grounds for declaring its rent claim nondischargeable. At the outset, exceptions to discharge must be literally and strictly construed against the creditor and liberally in favor of the debtor. *Colonial Nat'l Bank, USA v. Carrier (In re Carrier)*, 181 B.R. 742, 746 (Bankr.S.D.N.Y.1995); *Fellow, Read & Assocs. v. Rieder (In re Rieder)*, 178 B.R. 373, 376 (Bankr.S.D.N.Y.1995), *aff'd*, 194 B.R. 734, 737 (S.D.N.Y.1996), *aff'd without op.*, 116 F.3d 465 (2d Cir.1997); *Community Mut. Sav. Bank v. Landrin (In re Landrin)*, 173 B.R. 307, 310 (Bankr.S.D.N.Y.1994). Further, the proponent must prove each element by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 290, 111

S.Ct. 654, 112 L.Ed.2d 755 (1991); *New York v. Sokol (In re Sokol)*, 170 B.R. 556, 560 (Bankr.S.D.N.Y.1994), *aff'd*, 181 B.R. 27 (S.D.N.Y.1995), *aff'd*, 113 F.3d 303 (2d Cir. 1997).

### B. Fraud

Citing 11 U.S.C. § 523(a)(2)(A), Aldus first contends that on August 19, 1997, the debtor misrepresented that she would pay $1,236.00 by September 19, 1997. (Complaint at ¶ 18.) But for that misrepresentation, Aldus would have proceeded to trial and immediately evicted her. (*Id.* at ¶ 19.) Thereafter, the debtor continued to attempt to use the housing court to avoid her obligations, and twice moved to extend the time requirements set forth in the stipulation. (*Id.* at ¶ 21.)

■ Section 523(a)(2)(A) excepts from discharge any debt for money, property or services "to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's ... financial condition." A party proceeding under this subsection must establish five elements: (1) a representation, (2) falsity, (3) scienter, (4) justifiable reliance and (5) damage. *Fellows, Read & Assocs. v. Rieder*, 194 B.R. 734, 737 (S.D.N.Y.1996), *aff'd without op.*, 116 F.3d 465 (2d Cir.1997).

■ Aldus failed at trial to sustain its burden of proving its fraud claim. First, it did not identify any representation by the debtor. The August 19th stipulation, on which Aldus relies, does not contain a representation that the debtor will pay anything by September 19th. Rather, it gives her one month to pay, and if she fails, the warrant of eviction could issue without further notice.

■ Second, assuming the stipulation constituted a representation by the debtor that she would pay the back rent by September 19, 1997, it was not made with an intent to deceive Aldus. "As a rule, one who undertakes to perform an obligation, such as to pay a debt, impliedly represents that he intends to perform." In re Rieder, 178 B.R. at

---

information to Kraus at 9:17 a.m., she thought she would have to go to court. Later, she got

her brother to "pinch hit."

376; *accord* Restatement (Second) of Torts § 530, cmt. c (1977); *see Manufacturers Hanover Trust Co. v. Pannell (In re Pannell)*, 27 B.R. 298, 302 (Bankr.E.D.N.Y.1983) (quoting *Channel Master Corp. v. Aluminium Ltd. Sales, Inc.*, 4 N.Y.2d 403, 407, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958)). If the objection to dischargeability is based upon an unperformed promise, the proponent must show that the debtor did not intend to perform or had no reasonable basis to believe that she could perform when she made the promise. *Ellis v. Shear (In re Shear)*, 123 B.R. 247, 253 (Bankr.N.D.Ohio1991).

The debtor testified that she hoped to get the funds from her family. Aldus did not offer any evidence to show that her expectation of family support was unreasonable. I found her testimony credible on this point, particularly in light of her contemporaneous efforts to comply with the recertification process and her desire to renew her lease. Hence, I conclude that she did not intend to deceive Aldus.[6]

■ Finally, the debtor's subsequent efforts to obtain additional time to find another home do not make out fraud claims. The debtor sought stays of eviction through the presentation of two orders to show cause in September. On both occasions, her sister submitted affidavits stating that the debtor could not afford to pay the rent and needed additional time to move out. Treating these statements as those of the debtor, they were entirely truthful. More important, the housing court did not sign the orders to show cause or issue a stay on either occasion. In fact, Aldus's counsel conceded at trial that Aldus did not learn about the orders to show cause until well after the fact when she reviewed the court file.

For the foregoing reasons, I conclude that Aldus failed to sustain its burden of proving the elements of its claim under 11 U.S.C. § 523(a)(2)(A).

## C. Willful and Malicious Injury

Aldus next asserts a claim of willful and malicious injury under 11 U.S.C. § 523(a)(6). It charges that the debtor failed to certify her income, or more generally failed to cooperate, in the recertification efforts. (*Id.* at ¶ 22.) Her intentional and dishonest conduct caused Aldus to lose rental income, (*id.* at ¶ 23), and this debt should not be discharged.

■ Section 523(a)(6) prohibits the discharge of a debt incurred "for willful and malicious injury by the debtor to another entity or the property of another entity." "Willful" means "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury," *Kawaauhau v. Geiger,* —— U.S. ——, ——, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998), and includes conduct that the actor is substantially certain will cause injury. *See Ehrman v. Feist (In re Feist)*, 225 B.R. 450, 455 (Bankr.D.N.D. 1998); *McAlister v. Slosberg (In re Slosberg)*, 225 B.R. 9, 18 (Bankr.D.Me.1998); Restatement (Second) of Torts § 8A (1965). The term refers to intentional torts, and excludes negligent and reckless behavior. *Kawaauhau v. Geiger,* —— U.S. at ——, 118 S.Ct. at 977.

■ "The term 'malicious' means wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will." *Navistar Fin. Corp. v. Stelluti (In re Stelluti)*, 94 F.3d 84, 87 (2d Cir.1996). A "[s]pecific intent to harm or injure is not required." *Metromedia Co. v. Fugazy (In re Fugazy)*, 157 B.R. 761, 765 (Bankr.S.D.N.Y. 1993). Malice is implied when "anyone of reasonable intelligence knows that the act in question is contrary to commonly accepted duties in the ordinary relationships among people, and injurious to another." *Navistar Fin. Corp. v. Stelluti (In re Stelluti)*, 167 B.R. 29, 33 (Bankr.S.D.N.Y.1994) (internal quotation marks omitted), *aff'd,* 94 F.3d 84 (2d Cir.1996).

Aldus's injury arises from the debtor's breach of contract and not from an intention-

---

**6.** Although I have stopped here, I also note that Aldus failed to establish actual or justifiable reliance. Aldus did not call any witnesses to explain why it signed the stipulation. Its trial counsel conceded at least one reason: the debtor essentially consented to her own eviction in thirty days, assuming she failed to pay the rent, without the need to return to the housing court.

al tort. The lease obligated the debtor to cooperate with Aldus's recertification efforts, Aldus claims that she did not, and as a result, the unsubsidized portion of her rent increased. In this regard, many contractual breaches are willful. The party that deliberately fails to pay her obligee intentionally deprives him of his money.

■ Nevertheless, section 523(a)(6) does not encompass a breach of contract claim unless the same act constitutes an intentional tort such as conversion. *See Texas v. Walker,* 142 F.3d 813, 823–24 (5th Cir.1998), *petition for cert. filed,* 67 U.S.L.W. 3156 (Aug. 26, 1998) (No. 98–350); *In re Riso,* 978 F.2d 1151, 1154 (9th Cir.1992) (intentional breach of contract not excepted from discharge unless accompanied by willful and malicious conduct); *Novartis Corp. v. Luppino (In re Luppino),* 221 B.R. 693, 700 (Bankr.S.D.N.Y. 1998) (ordinary breach of contract is generally insufficient to deny a discharge under 11 U.S.C. § 523(a)(6) without some aggravating circumstance involving reprehensible conduct); *Huggins v. Thompson (In re Thompson),* 166 B.R. 849, 853 (Bankr.N.D.Tex.1994) (quoting *In re Riso* ); *Palazzolo v. Colclazier (In re Colclazier),* 134 B.R. 29, 33 (Bankr. W.D.Okla.1991) (cases excepting intentional breach of contract injuries from discharge "have done so only upon finding an independent, willful tort"). Indeed, the Court of Appeals in *In re Geiger,* 113 F.3d 848 (8th Cir.1997) (*en banc* ), *aff'd,* —— U.S. ——, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), rejected the broader definition of wilfulness, in part, because it would sweep breach of contract claims within the exception. *See id.* at 852 ("Indeed, we see no reason that a knowing breach of contract would not result in a judgment that would be exempt from discharge under this legal principle. Surely this proves too much.").

■ Here, Aldus has failed to prove independent, tortious conduct that would place its breach of contract claim within the scope of the exception. In fact, it has failed to show that the debtor acted wilfully or maliciously in any sense. Although the debtor did not provide the recertification information at the

pace that Kraus set, she nonetheless cooperated, or attempted to, within the August 10th time limit. She was anxious to renew her lease at the subsidized rent. Prior to the August 10th deadline, she faxed most of the information to Kraus. According to the trial testimony offered by Aldus, the debtor still had to supply the following: originals of the faxed documents, the questionnaire, a notarized acknowledgment that she did not have a bank account, the signed certification and her personal income tax return.[7]

The debtor could not complete the recertification without Kraus's assistance and cooperation. If nothing else, she had to sign the recertification at Kraus's office. In this regard, the debtor offered in her August 8th letter to come to Kraus's office the next day (a Friday), or Monday. She advised Ms. Peralta of Kraus that she would be home by 2:00 p.m. that day, and asked her to call. It would have been simple enough for the debtor to bring any missing paperwork to Kraus's office the next day, complete the questionnaire and sign the certification. But Kraus never called her back. This was an inexplicable omission considering the number of reminders Kraus had sent. As a result, although the recertification procedure was not completed, it was not due to the debtor's failure to cooperate.

Further, the debtor did not act with the malice required by the statute. The debtor tried to provide the information, but Kraus ignored her request for assistance and an interview. Instead, it declared a "default." On August 27, 1997, Kraus told the debtor that she had failed to comply with the recertification, and that her rent would increase to $1,350.00. (*See* PX 18.) In other words, it was too late to do anything. The debtor concluded that she could not afford to continue to live in the apartment, began looking for a new place to live, and eventually moved in with her mother. Under the circumstances, Aldus's contention that the debtor acted wilfully, maliciously or dishonestly is without merit. Accordingly, Aldus has failed to satisfy its burden of proof under 11 U.S.C. § 523(a)(6).

---

**7.** The debtor testified credibly that she had already mailed the income tax return.

The foregoing shall constitute the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a), made applicable to this adversary proceeding by Fed.R.Bankr.P. 7052. The Court shall enter a separate judgment simultaneously with the filing of this decision.